**Affirmed and Opinion filed January 7, 2020.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-17-00932-CR

**SANDRA JEAN MELGAR, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1435566**

## OPINION

Appellant raises two issues in this appeal from her conviction for murder. In the first issue, she argues that she is entitled to an acquittal because the evidence is legally insufficient to support the conviction. And in the second issue, she argues that, even if the evidence were sufficient to support the conviction, she is entitled to a new trial because the jury engaged in misconduct by conducting experiments during deliberations. For reasons explained more fully below, we overrule both of these issues and affirm the trial court's judgment.

# BACKGROUND

***The Discovery of the Body.*** The complainant in this case is Jaime Melgar, who was appellant's husband of thirty-two years. At the time of his death, Jaime and appellant were empty-nesters, living in a suburban home with just four small dogs.

Jaime had planned to host a holiday dinner for his brother and his brother's family. When these relatives arrived at Jaime's home on the scheduled date of the dinner, the front door was locked and no one was answering. Jaime's brother checked the backdoor, but it was also locked and nothing could be heard from the inside. The brother then went to the attached two-car garage, where the garage door on the right-hand side had been left open. Inside the garage, the brother found a closed but unlocked door leading into the kitchen. The brother went through that interior door, unlocked the front door for his family, and then heard cries for help coming from within the home.

The brother followed the cries to the en suite master bathroom, where he found a chair wedged under the handle of a closet door. The brother removed the chair, opened the closet, and found appellant lying on the floor. She was wearing a bathrobe, her ankles were bound, and her wrists were tied behind her back. The brother was unable to remove the ties with his bare hands, but at appellant's direction, he retrieved scissors from the bathroom and cut through the bindings, which had been made from a scarf and other stretchy material.

As the brother was freeing appellant, his family discovered Jaime in the closet of the master bedroom. His body was naked and cold. He had a knotted rope loosely wrapped around his chest, and telephone cords tied around his ankles. He was also covered in blood, with gash marks across his neck and torso.

Police and EMS were dispatched to the scene, having been told that one person was dead and another person was injured following a home invasion or burglary. But when the first responders arrived, they did not encounter the traditional hallmarks of a home invasion or burglary. There were no signs of forced entry. All of the doors and windows were intact. Also, no personal property appeared to be missing. Valuables were untouched and in plain view, and dresser drawers were only slightly opened, their contents undisturbed.

A deputy constable found appellant in the bathroom crying, but because she did not have any tears, the constable suspected that appellant may have been acting. When the constable asked appellant what had happened, appellant responded that the last thing she remembered was that she was taking a bath with Jaime and that Jaime had gotten out of the tub to check on the dogs because they were barking. Appellant added that she commonly has blackouts and seizures, and that she had no memory of the previous night.

Appellant was examined by a paramedic at the scene, who found no injuries on appellant's face, head, neck, or wrists. Appellant still complained of a bump on her head, but she declined to be transported to the hospital to receive additional medical attention. She agreed to go to police headquarters instead and to give a recorded statement to investigators.

***The Recorded Statement.*** Appellant told investigators that she and Jaime had gone out for dinner the night before to celebrate their anniversary, and that they had stopped at a store on their way home to pick up some drinks. Upon arriving home, they parked their car inside the garage on the left-hand side. According to appellant, the garage door on the right-hand side must have been closed, otherwise she would have noticed it.

3

Appellant said that she went inside, started the Jacuzzi tub, and mixed some drinks for herself and Jaime. Then they got into the tub, where they stayed for a long time (some two hours, she estimated) talking about their daughter and their plans for the future.

Appellant said that they heard their dogs barking outside at some point, and that Jaime got out of the tub to call the dogs back inside. Appellant claimed that she remained in the tub for the next fifteen minutes, and when Jaime failed to return, she went to her closet to put on some clothes and lotion. She said that she remembered nothing after that point until she woke up several hours later.

Appellant believed that she must have had a seizure during a home invasion because she did not remember hearing any screams or struggles or sounds of any kind. She explained that she had been experiencing frequent seizures lately, at least once a month, with auras happening "all the time." She claimed that her last seizure had occurred just a month earlier.

The investigators were troubled by appellant's demeanor. She was slow to answer their questions, and her answers tended to be evasive. She was covering her face and avoiding eye contact. And she was not displaying much emotion. Even when she sounded as though she were crying, she did not have any tears.

The investigators told appellant point blank that her story was not adding up. They asked her to explain why she had bruising on both of her upper arms. Appellant offered several explanations. She said that she is always bruised because she suffers from a chronic illness and takes many medications. She also said that she falls sometimes and bruises easily. She added that Jaime was not a violent man and that he never abused her. She suggested that some of the bruising may have been caused earlier that night when she left the tub to use the toilet and Jaime grabbed her arm to prevent her from slipping.

4

The investigators also asked appellant for her best understanding of how Jaime had died. Appellant said that Jaime did not have any known enemies, but she briefly offered some theories. She mentioned that Jaime had been driving slowly the night before and that he had likely angered a tailgater as they were heading home from the store. But appellant ultimately dismissed the tailgater as a possible suspect, saying that the tailgater had turned one way at an intersection, whereas she and Jaime had turned the opposite way.

Appellant also mentioned that she and Jaime owned rental properties and that there was a history of conflict with one of their tenants. But appellant dismissed the tenant as a suspect too, saying that she did not believe that the tenant was responsible for Jaime's death.

Appellant denied that she killed Jaime. She believed that she had been hit over the head and tied up by a home invader, and she regretted that she had no memory of the incident whatsoever.

***The Prosecution's Case.*** Appellant was ultimately charged with murder, and during her criminal trial, the prosecution theorized that she killed her husband and then staged the scene to resemble a home invasion gone wrong. This staging theory was based on the cumulative force of the circumstantial evidence, which we discuss in the following paragraphs.

The medical examiner testified that Jaime had suffered more than fifty bodily injuries. Thirty-one of those injuries were caused by sharp forces (i.e., stabs and incisions). The rest were caused by blunt forces. Most of the injuries were concentrated on Jaime's head, neck, torso, and upper extremities. Cuts on his hands were consistent with defensive wounds, which suggested to the medical examiner that, when he was attacked, Jaime had been alive and moving, not restrained.

5

The medical examiner did not find any ligature marks or hemorrhages around Jaime's ankles, where the telephone cords had been tied. The medical examiner explained that some sort of markings would be expected from the telephone cords if Jaime had still been alive and moving, especially considering that he was naked and the cords were directly in contact with his skin. But because there were no such injuries, the medical examiner opined that the telephone cords had been tied around Jaime's ankles after Jaime was already dead.

Other evidence reinforced that opinion. Photographs showed that Jaime's ankles had been crossed, which is an unnatural position for a living person resisting an attack. Also, a plastic dry cleaning bag was caught between Jaime's ankles and the telephone cords, and photographs showed additional plastic bags on the floor of the closet. The prosecution proposed that Jaime must have been dead on the floor when his ankles were tied, and that appellant, in a hasty effort to stage the scene, must have inadvertently wrapped the telephone cords around the dry cleaning bag.

Inside the master bathroom, investigators found a blouse, two towels, and a large kitchen knife, all submerged in the Jacuzzi tub. The knife belonged to the same brand of cutlery found in the kitchen, and Jaime's blood was detected on the blade, suggesting that it was the murder weapon. Outside the master bedroom, where Jaime's body lay dead, the master bathroom was the only room in the entire house where Jaime's blood was discovered. The prosecution proposed that no blood was found elsewhere because appellant killed Jaime in the master bedroom and then washed herself off in the master bathroom.

The prosecution proposed next that appellant opened the garage door after killing Jaime so that she could be "rescued" the following day by visitors, whom she was expecting for a holiday dinner. The prosecution likewise proposed that

appellant restrained herself in the bathroom closet so as to appear that she could not have been the killer. Through an in-court demonstration, the prosecution showed how appellant could have tied herself up. And through a video exhibit, the prosecution showed how appellant could have locked herself inside the bathroom closet by wedging a chair under the outside door handle.

The recreation of the wedged chair required the use of a pillow sham. On the video exhibit, an investigator began by entering the closet and then placing a pillow sham on the bathroom floor, with one end of the pillow sham inside the closet, and the other end outside the closet under the back two legs of the chair. The investigator then closed the closet door so that only a crack remained open. The investigator extended his hand through the crack and leaned the back end of the chair under the outside door handle, so that the chair was tilted at an angle and its front two legs were lifted off the ground. The investigator then brought his hand back inside the closet and pulled on the end of the pillow sham that was still at his feet. This pulling motion dragged the chair closer to the frame of the closet, and when the door shut completely, the chair became wedged securely under the handle as though it had been placed there deliberately by someone on the outside.

The recreation was inspired by an actual pillow sham that had been collected from the master bathroom. That pillow sham was torn, and the prosecution proposed that the tear was caused from the pulling motion when appellant staged the scene in the manner recreated in the video exhibit.

Aside from this physical evidence of staging, the prosecution drew attention to other evidence that undermined appellant's claim that Jaime had been killed at the hands of a home invader. For instance, the prosecution called a next door neighbor, who testified that she never heard appellant's dogs barking on the night of the murder, even though those dogs have woken her up on previous occasions.

Relatedly, the prosecution pointed out that if appellant could hear her dogs barking outside, as she first told investigators in her recorded statement, then she should have been able to hear Jaime fighting with a home invader during the fifteen minutes that she remained in the Jacuzzi tub. Yet appellant told investigators that she heard nothing during those fifteen minutes. Perhaps realizing this inconsistency, appellant told investigators near the end of her recorded statement that the Jacuzzi tub was sometimes loud and defective. The prosecution undermined that explanation with certain real estate documents, which showed that when appellant sold her home after the murder, she did not disclose that anything was defective with the Jacuzzi tub.

The prosecution also produced certain medical records from appellant's primary care physician. The records included notes from 2008, 2009, 2010, 2012 (the year of the murder), and 2013. Although these records affirmatively stated that appellant had been diagnosed with a seizure disorder some thirty years earlier when she was just a teenager, they also indicated that her condition was currently "stable." And in certain records dating back to just a few months before and after the murder, the primary care physician reported that appellant "has not had any seizure episodes." This evidence undermined appellant's claim during her recorded statement that she had been experiencing frequent seizures around the time of the murder.

The prosecution also showed that appellant visited her neurologist in 2013, after a more than ten-year hiatus, and just a few months after Jaime's murder. Contradicting the records from the primary care physician, which did not reflect any seizure episodes, the neurologist testified that appellant had complained of neurological issues, including a recent seizure, which could result in a loss of memory. But according to the neurologist's own records, appellant represented that

she had not experienced a seizure for a year, which was also inconsistent with what she had told investigators.

The prosecution candidly acknowledged that it could not determine what motive appellant would have for killing her husband, as there was no evidence that Jaime had ever been abusive or unfaithful. But motive is not an element of the offense, and the prosecution suggested that appellant may have killed Jaime just to collect his life insurance benefits, or alternatively, that she was simply unhappy with the marriage and she killed him because she belonged to a religion that did not approve of no-fault divorce.

In any event, the prosecution argued to the jury that appellant's claim of a home invasion was implausible. There was no forced entry. There was no property taken. And there was no blood outside of the master bedroom and master bathroom. If a third person had been responsible for brutally stabbing Jaime to death, the prosecution argued that there would have been traces of blood in other rooms as that person were leaving the home. Because there was no such blood evidence, the prosecution argued that the killer must have been appellant, the only other person who was admittedly there.

***The Defense's Case.*** Appellant did not testify during the trial, but her defense counsel attacked the prosecution's case on multiple fronts.

One of the defense's points related to the absence of DNA evidence. The defense showed that Jaime did not have appellant's DNA under his fingernails, and vice versa, that appellant did not have Jaime's DNA under her fingernails. Because skin scrapings would have been expected in a close hand-to-hand struggle and yet there was no DNA evidence indicative of such scrapings, the defense argued that appellant could not have been Jaime's killer.

9

To bolster that point, that defense emphasized that, in photographs taken after the murder, appellant did not have any broken fingernails or injuries to her hands. The defense also pointed out that the brutal attack on Jaime would have been difficult for appellant from a sheer physical standpoint. There was testimony that appellant had previously had a broken shoulder. Also, she suffered from rheumatoid arthritis, she had a double hip replacement, and she sometimes walked with a cane.

The defense produced family friends as witnesses, who testified that appellant would have auras and forget things. The same family friends testified that appellant and Jaime were a happy couple who did not appear to be suffering from any sort of marital discord or financial problems. Along those same lines, a digital forensics analyst who examined the couple's computers and cellphones testified that there was no evidence of any extramarital relationships, nor any suspicious Internet searches like how to tie knots or clean up a murder.

The defense also emphasized the testimony from Jaime's brother, who said that when he found appellant trapped in the bathroom closet, the chair that had been wedged under the handle was in direct contact with the tile floor, not a pillow sham. The defense accordingly suggested that appellant did not stage the scene as the prosecution had proposed.

The defense also criticized the prosecution for what it considered a faulty investigation. The defense noted that the lead investigator assigned to Jaime's murder had a reputation among law enforcement for being untruthful and for doing sloppy police work. The defense criticized this investigator for not exploring other suspects, including a neighbor with a penchant for committing theft who was spotted lingering around the property after the first responders had arrived.

The defense further criticized the prosecution's argument that no theft had been committed. The defense pointed out that a backpack had been found in the garage containing a video gaming console and jewelry belonging to appellant. The defense proposed that the home invader had dropped the backpack as he was fleeing the property, perhaps because he had been startled.

***The Verdict.*** The jury rejected appellant's defensive theories, convicted her as charged, and assessed punishment at twenty-seven years' imprisonment with a fine of ten thousand dollars.

## SUFFICIENCY OF THE EVIDENCE

To obtain the conviction for murder in this case, the prosecution was required to prove beyond a reasonable doubt that appellant intentionally or knowingly caused Jaime's death, or that she intended to cause serious bodily injury and committed an act clearly dangerous to human life that resulted in Jaime's death. *See* Tex. Penal Code § 19.02(b)(1)–(2).

In deciding whether the prosecution satisfied that burden, we examine all of the evidence in the light most favorable to the verdict. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). Under this standard of review, we have no power to reevaluate the weight and credibility of the evidence, or to substitute our judgment for that of the factfinder. *Id.* Quite the opposite, we must honor all findings that are supported by the evidence and by any reasonable inferences that can be drawn from the evidence. *Id.* If the record reveals any conflicts in the evidence, we presume that the factfinder resolved the conflicts in favor of the judgment that was actually rendered. *Id.*

The main element in dispute in this sufficiency challenge is identity—i.e., whether appellant was the person who caused the death of her husband. There is no

direct evidence in support of that element, but a conviction does not require direct evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is just as probative as direct evidence. *Id.* And the record here contains an abundance of circumstantial evidence establishing that appellant was the offender.

The circumstantial evidence begins with the undisputed fact that appellant was present in the home when Jaime was murdered. Based on that fact, the jury knew that appellant at least had the opportunity to commit the murder.

In addition to that opportunity, there was evidence that the murder was physically possible for appellant to commit. Testimony from the medical examiner established that Jaime was short and thin, weighing only 125 pounds at the time of his death. Appellant was shorter than Jaime, but she outweighed him by more than fifteen pounds, according to medical records dated just a few months before the murder. Based on this evidence, the jury could have reasonably concluded that appellant was capable of overpowering Jaime in a physical attack.

There was also evidence that appellant engaged in this physical attack. She had bruises on both of her upper arms in the hours after the murder. The jury could have reasonably concluded that the bruises were caused by Jaime as he resisted her brutal stabbing.

The jury also had a substantial basis for concluding that no other person could have committed the murder. There was ample testimony that all of the doors and windows around the home were intact. And appellant specifically told investigators during her recorded statement that the garage doors had been closed when she and Jaime returned home from the store. If the jury credited that statement—and we must presume that it did—then the jury could have determined

that there were no open points of entry into the home that a third party could have exploited.

There was of course undisputed evidence that one of the garage doors had been opened by the following day, but the evidence did not establish when that door was opened, or who had opened it. For at least two reasons, the jury could have reasonably concluded that appellant had opened the garage door herself after she murdered Jaime: first, the open door would allow her to redirect blame for the murder on a fictional home invader, whom she could attempt to manufacture with other evidence of staging; and second, the open door would allow her to be "rescued" by relatives, whom she anticipated in a matter of hours.

Evidence of staging is a circumstance that supports a determination of guilt. *See Temple v. State*, 390 S.W.3d 341, 361 (Tex. Crim. App. 2013) (upholding a murder conviction where there was evidence to support a finding that the defendant had staged the scene to resemble a home invasion gone wrong). And such evidence was plentiful here.

There was evidence of staging on Jaime's body. He had telephone cords tied around his ankles, which might suggest that he had been restrained by a home invader, but as the medical examiner testified, there were no ligature marks or hemorrhages around those ties, which suggested that Jaime's ankles had actually been tied after his death. The jury could have reasonably concluded that appellant was responsible for the ties because a home invader would not have expended the time and effort to restrain Jaime in this manner if he were already dead.

There was evidence of staging in the torn pillow sham, which had been found by investigators in the master bathroom. With the aid of the video exhibit, the jury could have reasonably concluded that appellant had locked herself in the bathroom closet by using the pillow sham to wedge a chair under the outside door

13

handle. Even though Jaime's brother had testified that the chair had been in direct contact with the tile floor, and not the pillow sham, the jury was free to reject that testimony and draw the opposite inference.

There was also evidence of staging in the backpack that had been discovered in the garage. The backpack contained some valuable items from within the home, which might suggest that a home invader had gathered them, but testimony revealed that the backpack formerly belonged to appellant's daughter, who was living in Europe at the time of the murder. The jury could have reasonably concluded that a home invader would have brought his own bags for carrying away loot, and that he would not have left the bags at the scene. Especially considering that no other valuables were missing from the home and that the dresser drawers appeared to be undisturbed, the jury was free to believe that appellant had stuffed the backpack herself, and then planted it in the garage for investigators to discover later.

Appellant's demeanor after the murder was another circumstance of guilt. More than one witness testified that appellant appeared to be crying without tears, which supported a finding that her emotions were not sincere. And during her recorded statement, she was slow to respond to the investigators' questions, suggesting that she was withholding information and carefully choosing her words. *Id.* at 362 (considering in a sufficiency analysis that the defendant "lacked emotion after discovering that his wife had been shot" and that, during his interview with detectives, "he was hesitant in his answers, and he still did not cry").

There were also the inconsistencies in appellant's own statements. She told investigators that she could hear her dogs barking outside, but she denied hearing any sort of struggle inside the home at the time she claimed a home invader was attacking her husband. She also told investigators that she had been experiencing

14

frequent seizure activity around the time of the murder, but after the murder, she told her primary care physician that she had not had any recent seizure episodes, and she told her neurologist that she had only experienced a single seizure in the previous year. Appellant's seizure disorder was central to her trial defense because it purported to explain why she could not remember any details about the claimed home invasion. But because her statements about her seizure disorder were inconsistent, the jury could have reasonably determined that the entire defense was not credible. *Id.* at 361 (considering in a sufficiency analysis the defendant's inconsistent statements as a circumstance of guilt).

Appellant responds with dozens of bullet points, spread over more than twenty consecutive pages in her brief, all attacking the prosecution's case and explaining why she could not have been the person who killed her husband. These points emphasize such facts as the absence of appellant's DNA on Jaime's person, the absence of Jaime's DNA on appellant's person, and the absence of Jaime's blood on any surface in the master bathroom (with the exception of the knife) where appellant might have washed herself off. We cannot indulge these points or any of the others raised in the brief because they all lead to inferences that were rejected by the jury, and under our standard of review, we must consider all of the evidence in the light most favorable to the jury's decision. *See Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993) ("The evidence is not rendered insufficient simply because appellant presented a different version of the events."). Furthermore, the absence of DNA or blood evidence is not dispositive. *See Temple v. State*, 342 S.W.3d 572, 640 (Tex. App.—Houston [14th Dist.] 2010) (concluding that the evidence was sufficient to support the conviction for murder, despite a forensic analysis showing that none of the complainant's blood or brain matter was found on the defendant or his clothing, and despite other testimony showing that

the defendant had a very short window of time—not hours, as in appellant's case—to wash himself off and dispose of any incriminating evidence), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013).

Based on the cumulative force of all of the evidence presented and of the reasonable inferences that could be drawn from that evidence, the jury had a rational basis for concluding that appellant was the person who attacked her husband and that she intentionally or knowingly caused his death. We accordingly conclude that the evidence is legally sufficient to support every essential element of the offense beyond a reasonable doubt.

## MOTION FOR NEW TRIAL

The defense filed a motion for new trial, alleging that the jury had engaged in misconduct after retiring to deliberate during the guilt phase of the proceedings. The only evidence offered in support of the motion was an affidavit from one of appellant's lawyers, who attested in material part as follows:

> I had the opportunity to speak with jurors before they retired from jury duty on the Sandra Melgar case. The entire panel was present, including my co-counsel [and] the prosecutor . . . . When the prosecutor asked the jurors what they thought of the demonstrations, [one juror] stated that many of the jury members had tied themselves up to see if it was possible to get [loose] from the bindings. [The juror] stated that they had done a demonstration and that on the first day of deliberations, [another juror] was rolling around, tied up, on the floor, and that [the other juror] tried to get herself out of the ties and that they wanted to see how much you could see while rolling around and for how long.

At the hearing on the motion for new trial, the prosecutor objected to the affidavit on the basis of hearsay, but the trial court overruled the objection and admitted the affidavit. The defense then argued that the jury's experiments were improper because the defense was unable to see whether the jury had used bindings

16

that were similar to the bindings that were described by appellant and her defense witnesses. The trial court denied the motion for new trial without making any comments or findings of fact.

Appellant now complains of the trial court's ruling, which we review for an abuse of discretion. *See Briggs v. State*, 560 S.W.3d 176, 183–84 (Tex. Crim. App. 2018). Because this is a deferential standard of review, we consider all of the evidence in the light most favorable to the trial court's ruling. *Id.* at 184. A trial court abuses its discretion only when no reasonable view of the record could support its ruling. *Id.*

The defendant is entitled to a new trial "when, after retiring to deliberate, the jury has received other evidence" or "when the jury has engaged in such misconduct that the defendant did not receive a fair and impartial trial." *See* Tex. R. App. P. 21.3(f)–(g). "As a general rule it is improper for a juror to perform experiments or demonstrations in the jury room," but such misconduct does not require the granting of a new trial unless "some new fact, hurtful to appellant, was discovered by the examination and experiment." *See McLane v. State*, 379 S.W.2d 339, 342 (Tex. Crim. App. 1964). Whether the jury received such new information is a question of fact for the trial court to decide. *See Tollett v. State*, 799 S.W.2d 256, 259 (Tex. Crim. App. 1990).

Here, the only evidence establishing the jury's alleged experiments was the affidavit testimony of appellant's lawyer. The trial court could have disbelieved this affidavit testimony, even though it was uncontroverted, simply because it was hearsay. *See Colyer v. State*, 428 S.W.3d 117, 126 (Tex. Crim. App. 2014) (recognizing that the trial court is free to discredit post-trial testimony even when it is wholly uncontroverted). That reasoning alone would fully support the trial court's ruling.

But even if the trial court credited the affidavit's hearsay testimony, the trial court was still not required to grant the defense's motion. The affidavit contains no details about the types of materials the jurors used in tying themselves up, or what sorts of knots they attempted to recreate, or the placements of their wrists and ankles during these recreations. Because the affidavit contains no information about these matters, the trial court was free to determine that the jurors' experiments, though improper, did not differ in any way from the prosecution's in-court demonstration. Accordingly, the trial court could have reasonably concluded that the jury did not discover any new fact in their experiments that was hurtful to appellant. *See Douthit v. State*, 482 S.W.2d 155, 160 (Tex. Crim. App. 1971) (upholding the denial of a motion for new trial, despite evidence that one juror had tried to tie herself up in the jury room using the electric cord from a coffee pot), *overruled on other grounds by Ex parte McWilliams*, 634 S.W.2d 815 (Tex. Crim. App. 1980) (op. on reh'g); *see also McLane*, 379 S.W.2d at 342 (there was no harm where one juror experimented with the silk stocking of another juror to recreate the look of a masked robber); *Ingram v. State*, 363 S.W.2d 284, 285 (Tex. Crim. App. 1962) (there was no harm where the jury experimented with snuff); *Gahagan v. State*, 242 S.W.3d 80, 89–90 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (there was no harm where the jury experimented with a gun).

Appellant suggests that the jury's experiments were improper even if they did track the prosecution's in-court demonstration because the prosecution's demonstration did not accurately replicate the facts as described by various defense witnesses. This point merely highlights a conflict in the evidence, and we presume that the jury resolved that conflict on its own.

Appellant also suggests that the experiments were improper because some of them occurred "presumably at home (away from other jury members and

deliberations).” But the affidavit does not state that any experiments occurred at home. Based on the limited evidence that was presented, and consistent with our standard of review, the trial court could have reasonably concluded that the experiments occurred in the deliberation room and that they produced no new facts that were harmful to appellant.

## CONCLUSION

The trial court's judgment is affirmed.


/s/            Tracy Christopher
                        Justice


Panel consists of Justices Christopher, Spain, and Poissant.

Publish — Tex. R. App. P. 47.2(b).