# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00311-CR

---

**Daniel Heredia, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2016-751, THE HONORABLE R. BRUCE BOYER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Daniel Heredia of the offense of manslaughter and assessed punishment at 20 years' imprisonment. *See* Tex. Penal Code § 19.04. The district court rendered judgment on the verdict. In four points of error on appeal, Heredia asserts that: (1) the evidence is insufficient to prove that he committed the offense; (2) the district court abused its discretion in denying his request for a mistrial; (3) the district court abused its discretion in admitting evidence of his internet search history; and (4) the judgment of conviction erroneously contains an affirmative deadly weapon finding. We will affirm the judgment of conviction.

## BACKGROUND

The State charged Heredia with murder, alleging that he intentionally or knowingly caused the death of Jennifer Rivers by shooting her with a firearm. *See id.* § 19.02.

At trial, Heredia did not dispute that he shot Rivers and caused her death. Instead, he claimed that he shot Rivers accidentally and thus was guilty of criminally negligent homicide. *See id*. § 19.05.

The jury heard evidence that on June 26, 2016, Heredia and his friends, William Griffin and Joseph Gaona, were floating in inner tubes on the Guadalupe River in New Braunfels when they encountered Rivers, who was diving in the river and looking for items that had been left behind by tourists. Heredia invited Rivers to join them, and Rivers agreed. Gaona testified that when they floated toward Rivers, Heredia told him that he was "going to try to have sex with her" and that after Rivers joined them, Heredia flirted with her and asked her repeatedly to "flash" her breasts at him. According to Gaona, Rivers was not receptive to Heredia's advances and "kept saying no" but eventually agreed to let the men "pour[] beer down her breasts while [Heredia] drank it."

Later that day, the four of them went to Heredia's RV trailer, which was parked at a campsite near the river, and proceeded to drink, mingle, and listen to music. Gaona recounted that when they were inside the trailer, he observed Heredia attempt to put his hand on Rivers's upper thigh and that Rivers "pushed his hand away." Gaona did not believe that Rivers wanted to have sex with Heredia, who was "pretty intoxicated" at the time. Gaona eventually left the campsite, but Heredia, Griffin, and Rivers remained. Griffin testified that while they were inside the trailer, Heredia and Rivers were dancing, conversing, and "playfully wrestling" with each other. According to Griffin, at one point during their interaction, Heredia was standing behind Rivers when Griffin saw Heredia "mouth" silently to him that "he wanted to kill her." Then, Griffin claimed, he saw Heredia "grab his .22 [caliber pistol] out of his waistband and without . . . hesitation shoot[] the young woman in the back of the head." Griffin immediately exited the

2

trailer, sat down at a picnic table, and "started contemplating life." As Griffin sat outside and his "mind went blank," he could hear "something getting dragged" inside the trailer. Shortly thereafter, Heredia "popped his head out" and asked Griffin, "Are you good?" Griffin, who testified that he was "really scared" at that point, had difficulty recalling what happened next, but he remembered that he helped Heredia pack up their belongings and that they left the campsite and drove back to Wallisville in Chambers County, where they both lived.

Griffin testified that during their drive home, Heredia was drinking a bottle of vodka, "slowly getting drunker," and "talking and listening to music." At one point, Heredia told Griffin that he needed to "go check on the trash," which Griffin believed was a reference to Rivers's body, still inside the trailer. Griffin also claimed that at some point, Heredia told him that he had killed Rivers because "she was getting annoying."

Several hours after leaving the campsite, Heredia and Griffin arrived at Heredia's house, where Heredia lived with his parents. Heredia told Griffin to get his father, who helped Griffin back up the trailer closer to the house. Griffin then got into his truck and drove away. As he left the property, he noticed that Heredia was "passed out on the ground" drunk.

Later that night, Heredia's girlfriend, Megan Armberger, arrived at Heredia's house to pick up some of her belongings. Outside the trailer, Armberger encountered Heredia, who was drinking a bottle of water and "trying to sober up." Armberger testified that Heredia appeared "frantic" and was crying, and she had never seen him cry before. Heredia accompanied Armberger inside the trailer, where she observed a broken liquor bottle and a pair of women's shoes that did not belong to her. This upset Armberger, who asked Heredia to explain what had happened. Heredia told her that Griffin had "gone crazy" but did not provide her with any details. Armberger then told Heredia that she needed to use the restroom, but Heredia asked her

3

to leave. Armberger replied that she was not leaving and demanded to know what had happened. In response, Heredia told her that he and Griffin had killed a woman. Armberger did not believe him and asked to see the body. Heredia opened the trailer door, and Armberger saw a body laying on the ground outside between the shed and the garage. Armberger testified that Heredia provided her with only limited information about the shooting—"that [Griffin] went crazy, [Rivers] made them mad, and then that they were playing a game. They didn't know [the gun] was loaded." Armberger, believing that the shooting was an accident, encouraged Heredia to tell his parents what had happened, but Heredia "just got quiet." Armberger then got into her car and left. She went to her mother's house, told her mother what had happened, and her mother called the police.

After Armberger left, Heredia called his brother and asked him to come over to the house. When Heredia's brother arrived and Heredia explained to him what had happened, Heredia called 911 to report the shooting. After Heredia hung up, his brother also called 911 and provided additional details. Copies of the 911 calls were admitted into evidence and played for the jury. On the calls, Heredia can be heard telling the dispatcher that a woman's body was in his yard, and his brother can be heard telling the dispatcher that Heredia had shot the woman accidentally.

When police arrived at the residence, Heredia agreed to accompany the officers to the station and provide a statement. A video recording of Heredia's statement was admitted into evidence and played for the jury. In the statement, Heredia confessed to shooting Rivers but claimed that he did not know the gun was loaded and that he did not intend to shoot Rivers. He explained that he was "trying to be all gangster" by showing off his gun to impress Rivers and

4

that he was waving it around when he discharged the gun accidentally. He admitted that he was "dumb" for "playing" with the gun without checking to see if it was loaded.

An autopsy confirmed that Rivers's cause of death was homicide, that she had been shot in the back of the head with a firearm, and that her body had been moved after death. Forensic evidence revealed that the shot to her head was "pretty much straight on," i.e., perpendicular to the skull itself. There was no exit wound, and a bullet that had been fired from a .22 caliber pistol was recovered from Rivers's skull.

At the conclusion of trial, the jury found Heredia guilty of neither murder nor criminally negligent homicide but instead found him guilty of manslaughter. This appeal followed.

## ANALYSIS

**Sufficiency of the evidence**

In his first point of error, Heredia asserts that the evidence is insufficient to prove that he committed the offense of manslaughter. A person commits the offense of manslaughter "if he recklessly causes the death of an individual." Tex. Penal Code § 19.04(a). Heredia claims that there is no evidence in the record that he acted "recklessly."

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "We view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id*. "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id*. "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence

5

produced at trial." *Id.* "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

"Reviewing the sufficiency of the evidence of recklessness, the question before us . . . is whether, after viewing all the evidence in the light most favorable to the verdict, any rational finder of fact would have found beyond a reasonable doubt that Appellant acted recklessly." *Romano v. State*, ___ S.W.3d ___, ___, 2020 WL 6301716, at *3 (Tex. Crim. App. 2020). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tex. Penal Code § 6.03(c). "The risk must be of such a nature and degree that it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* "By its nature, a culpable mental state must generally be inferred from the circumstances," including the accused's "acts, words, and conduct." *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018).

Heredia argues that "[t]here was no evidence adduced from which a jury could conclude or infer that Appellant knew that the firearm he was holding was loaded; therefore, he did not know of a risk and consciously disregard the danger as required to be found reckless under the Manslaughter statute." In Heredia's view, the jury could have found, at most, that Heredia "should have checked the gun and, therefore, should have known that the weapon was loaded, which could have amounted to criminal negligence."

However, a jury may infer recklessness from evidence that a defendant was familiar with firearms and pointed a firearm in the victim's direction, even if the defendant

6

claimed not to know that the firearm was loaded. *See, e.g.*, *Guzman v. State*, 188 S.W.3d 185, 193-94 (Tex. Crim. App. 2006); *Lugo v. State*, 667 S.W.2d 144, 149 (Tex. Crim. App. 1984); *Gahagan v. State*, 242 S.W.3d 80, 87-88 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Hayes v. State*, 124 S.W.3d 781, 788 (Tex. App.—Houston [1st Dist.] 2003), *aff'd*, 161 S.W.3d 507 (Tex. Crim. App. 2005); *Davis v. State*, 757 S.W.2d 386, 388 (Tex. App.—Dallas 1988, no pet.); *Gaona v. State*, 733 S.W.2d 611, 615 (Tex. App.—Corpus Christi 1987, pet ref'd); *Yates v. State*, 624 S.W.2d 816, 817 (Tex. App.—Houston [14th Dist.] 1981, no pet.). This is because firearms are "dangerous instrumentalities," and their "very purpose is to kill or injure should the necessity arise." *Sadler v. State*, 728 S.W.2d 829, 832 (Tex. App.—Dallas 1987, no pet.). Thus, "[i]t is mandatory that they be handled at all times with great care and the failure to do so may be legitimately viewed by the trier of the fact as 'a gross deviation from the standard of care that an ordinary person would exercise....'" *Id.* (quoting Tex. Penal Code § 6.03(c)); *cf.* Tex. Penal Code § 22.05(c) (establishing presumption in deadly conduct statute that "[r]ecklessness and danger are presumed if the actor knowingly pointed a firearm at or in the direction of another whether or not the actor believed the firearm to be loaded").

Here, the State presented evidence that Heredia was familiar with firearms. Griffin testified that when he and Heredia were in high school together, they would shoot at targets on Heredia's property using shotguns. Griffin added that Heredia "was around guns a lot" and handled them "pretty well." Heredia's girlfriend provided similar testimony. She testified that Heredia: "had guns at his house, and he went hunting and stuff"; would shoot at targets in his backyard; could explain to her how to use and operate firearms safely; owned "a lot" of firearms; and knew how to make homemade bullets that could be fired from a gun. Additionally, in his statement to the police, Heredia admitted that the gun that was used in the

7

offense belonged to him, that he had shot the gun many times, and that he was familiar with its operation. Because of Heredia's familiarity with firearms, including the gun that was used to shoot Rivers, the jury could have disbelieved Heredia's claim that he did not know the gun was loaded and reasonably inferred that when Heredia waved the gun near Rivers and pointed it in her direction, he was aware of but consciously disregarded a substantial and unjustifiable risk that the gun could discharge and kill Rivers. *See Gahagan*, 242 S.W.3d at 88; *Davis*, 757 S.W.2d at 387-88; *see also Lugo*, 667 S.W.2d at 149 (concluding that jury could have found defendant guilty of manslaughter by rejecting defendant's claim that he was unaware that gun was loaded but believing defendant's claim that he did not intend to kill victim); *Salvato v. State*, No. 03-17-00508-CR, 2019 WL 1051595, at *5 (Tex. App.—Austin Mar. 6, 2019, no pet.) (mem. op., not designated for publication) (concluding that evidence was sufficient to uphold manslaughter conviction because jury was free to disbelieve defendant's "self-serving statements indicating that he did not believe the rifle would fire a round when he pulled the trigger or that he was not aiming at or toward his daughter when he pulled the trigger," particularly in light of defendant's training regarding firearms and his experience with them); *King v. State*, No. 12-07-00433-CR, 2010 WL 1510204, at *3 (Tex. App.—Tyler Apr. 16, 2010, pet. ref'd) (mem. op., not designated for publication) (concluding that evidence was sufficient to support manslaughter conviction when evidence showed that defendant was familiar with guns, knew risks involved in handling them, and caused firearm to point in victim's direction).

We overrule Heredia's first point of error.

**Motion for mistrial**

During the testimony of one of the officers who interviewed Heredia, defense counsel requested that the video recording of Heredia's statement be admitted into evidence. The State objected, arguing that the statement was inadmissible hearsay unless the State offered it into evidence as an "admission by a party opponent." *See Allridge v. State*, 762 S.W.2d 146, 152 (Tex. Crim. App. 1988) (explaining that self-serving, out-of-court statements made by and offered into evidence by defendant are generally considered inadmissible hearsay); *Drone v. State*, 906 S.W.2d 608, 611 (Tex. App.—Austin 1995, pet. ref'd) ("But an out-of-court statement by a party *offered against the party* is not hearsay by definition, and is admissible as an admission by party-opponent." (emphasis added) (citing Tex. R. Evid. 801(e)(2)(A))). In arguing to the district court that the statement was inadmissible, the prosecutor remarked, with the jury present, "If the defendant wants to give his version of events, he's welcome to take the witness stand." At that point, defense counsel asked to approach the bench, and the jury was removed from the courtroom.

As the parties continued to discuss the admissibility of the statement outside the presence of the jury, defense counsel stated, "We still have a very serious mistrial issue right now after that last sidebar remark." After further discussion on the admissibility of the statement, the district court addressed the prosecutor's comment:

> Now, let's talk about the sidebar. This jury has been admonished as a panel.[1] Also, I believe as—also as having been sworn with regards to the Fifth Amendment rights that all people have on several different occasions. I'm not

---

[1] The district court had admonished the panel during jury selection that it could not hold a defendant's decision not to testify against him. The State also discussed during jury selection the defendant's right not to testify.

9

going to grant a mistrial over just that one statement that she made. I will admonish the jury once again to ignore that sidebar and to reiterate, once again, how important the right under the Fifth Amendment is.

Defense counsel replied,

All right. For the record purposes, I'm moving for mistrial, and I'm alleging intentional prosecutorial misconduct. [The prosecutor] knows this trial is not going the way she wants it to. She just spiked the ball, Judge. She's goading me into moving for a mistrial because she wants a do-over.

After hearing additional argument from the parties and considering case law on the matter, the district court denied the motion for mistrial. In his second point of error, Heredia asserts that the district court abused its discretion by not granting a mistrial.

"We review a trial court's denial of a mistrial for an abuse of discretion." *Balderas v. State*, 517 S.W.3d 756, 783 (Tex. Crim. App. 2016). "We review the evidence in the light most favorable to the trial court's ruling and consider only those arguments before the court at the time of the ruling." *Turner v. State*, 570 S.W.3d 250, 268 (Tex. Crim. App. 2018). "The trial court's ruling must be upheld if it was within the zone of reasonable disagreement." *Id*.

"A mistrial is an appropriate remedy in extreme circumstances for a narrow class of highly prejudicial and incurable errors." *Id*. "A mistrial halts trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). "Whether an error requires a mistrial must be determined by the particular facts of the case." *Id*. "[T]he question of whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). "In effect, the trial court conducts an appellate function: determining whether improper conduct is so harmful that

the case must be redone." *Id*. "Of course, the harm analysis is conducted in light of the trial court's curative instruction." *Id*. "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id*.

In determining whether a trial court abused its discretion in failing to grant a mistrial following an improper remark by the prosecutor, reviewing courts are to consider: (1) the severity of the remark (the magnitude of the prejudicial effect of the prosecutor's remark); (2) the measures adopted to cure the remark (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the remark (the strength of the evidence supporting the conviction). *Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011); *Ramon v. State*, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

"A comment on a defendant's failure to testify violates both the state and federal constitutions as well as Texas statutory law." *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011); *see* U.S. Const. amend. V; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. art. 38.08. However, the implication that the State's comment referred to the defendant's failure to testify must be "a clear and necessary one." *Randolph*, 353 S.W.3d at 891. "It is well settled that a prosecutor's comment amounts to a comment on a defendant's failure to testify only if the prosecutor manifestly intends the comment to be, or the comment is of such character that a typical jury would naturally and necessarily take it to be, a comment on the defendant's failure to testify." *Wead v. State*, 129 S.W.3d 126, 130 (Tex. Crim. App. 2004). "It is not sufficient that the comment might be construed as an implied or indirect allusion to the defendant's failure to testify." *Id*.

11

Here, the prosecutor remarked to the district court, in the presence of the jury, that "[i]f the defendant wants to give his version of events, he's welcome to take the witness stand." The State argues that because this comment was made during the State's case in chief, before the defendant had an opportunity to testify, it should not be construed as a direct comment on the defendant's failure to testify. *See McCarron v. State*, 605 S.W.2d 589, 595 (Tex. Crim. App. 1980) (concluding that comment made by prosecutor during State's case in chief was not improper comment on defendant's failure to testify because at time comment was made, "the State had not closed its case and appellant had not rested her case"). However, the Court of Criminal Appeals has more recently held that the timing of the comment is "not dispositive" and that "[a] statement can be a comment on the defendant's failure to testify even if it is made before the defendant rests his case." *Bustamante v. State*, 48 S.W.3d 761, 767-77 (Tex. Crim. App. 2001).

The State also argues that because the comment was directed to the district court and was intended to prevent the defendant's recorded statement from being used "as a conduit through which appellant could testify without taking the stand," the comment was less egregious than if it had been made directly to the jury. *See Moore v. State*, 999 S.W.2d 385, 405 (Tex. Crim. App. 1999) (concluding that prosecutor's comment made under similar circumstances was improper, but not "so blatant that it rendered an instruction to disregard ineffective"). Nevertheless, the prosecutor made her comment in the jury's presence when she should not have done so, and the State acknowledges in its brief that the prosecutor should have asked to approach the bench before discussing the admissibility of the evidence. Moreover, the prosecutor's comment referred expressly to Heredia taking the witness stand "if [he] wants to give his version of events." We conclude that this comment was of such character that a typical

12

jury would naturally and necessarily take it to be a comment on the defendant's failure to testify. Accordingly, the first factor weighs in favor of granting a mistrial.

The second factor considers the measures adopted to cure the remark. After the district court denied Heredia's motion for mistrial, it warned the prosecutor that if she were to repeat her error, "I can assure you a mistrial would be granted." The jury then returned to the courtroom and the district court provided the following instructions:

> Ladies and Gentlemen, prior to the break, you'll recall we witnessed a heated discussion or exchange between the two attorneys in this matter, and more specifically from the State, with regards to the defendant—as to whether or not the defendant would testify.
>
> As you've been admonished several times, beginning in the voir dire process and continuing through the trial, we all have, under the Fifth Amendment of our Constitution, the right not to testify. Nobody can force anyone to give testimony or evidence against themselves or against their own interests.
>
> That is always the case. It is still the case. You are to totally disregard—totally disregard the prosecutor's comments in that regard. They were out of place, and they are not to be taken into consideration whatsoever by you in any way, shape, or form. And you'll also have another admonishment in that regard in the jury charge at the completion of the evidence in this matter.

Before the trial continued, the district court asked the jury if it understood its instructions, and the record reflects that the jury did.

Later, the district court decided to take additional action. The district court had originally sustained the State's objection to the admissibility of Heredia's recorded statement to the police. Now, however, the district court changed its mind:

> My position on this video has changed somewhat in light of our previous situation

13

with regards to comments about the Fifth Amendment and his right to testify. In looking at the three prongs, of course, the severity of it is one issue. Measures to cure. Now, who knows if you can un-ring the bell or not? But when it gets down to—I don't want to say confrontation issues, but the fact that it's been alluded to, I don't believe that should force him to make a decision as to whether or not he should testify or not. And so I'm going to allow the video to come in.

The district court added, "I think that issue needs to be mitigated. And I think by producing that video is the only way to do it at this point." This was a significant curative measure, because the decision to admit the recorded statement had the effect of enabling Heredia, contrary to the prosecutor's comment, to "give his version of events" *without* taking the witness stand.

Additionally, the court's charge to the jury included the following instructions on Heredia's right not to testify:

The defendant has a constitutional right to remain silent. The defendant may testify on his own behalf. The defendant may also choose not to testify. The defendant's decision to testify cannot—the defendant's decision not to testify cannot be held against him, and it is not evidence of guilt.

You must not speculate, guess, or even talk about what the defendant might have said if he had taken the witness stand or why he did not. The foreperson of the jury is to immediately stop any juror from mentioning the defendant's decision not to testify.

After the district court read these instructions to the jury, the district court added, for emphasis, "It is not to be considered, folks." We conclude that the district court adopted strong measures to cure the remark. Thus, the second factor weighs against granting a mistrial.

Finally, we consider the strength of the evidence supporting Heredia's conviction. In addition to Heredia's recorded statement to the police, in which he admitted to shooting Rivers and made statements from which the jury could reasonably infer that he was familiar with

14

and had been reckless with the gun that he used to shoot Rivers, the jury also considered Griffin's testimony that Heredia had pointed the gun at Rivers's head and pulled the trigger; forensic evidence that supported Griffin's testimony that the gun had been pointed at Rivers's head; Armberger's testimony that Heredia admitted to her that he and Griffin had "killed a woman" earlier that day and that he had showed her the body; and the 911 calls in which Heredia reported that Rivers's body was in his backyard and Heredia's brother reported that Heredia had killed the woman. We conclude that the evidence supporting Heredia's conviction was strong. Thus, the third factor weighs against granting a mistrial.

In summary, although the first factor weighs in favor of granting a mistrial, the second and third factors weigh against granting a mistrial. We cannot conclude on this record that the district court's decision to deny Heredia's motion for mistrial was outside the zone of reasonable disagreement.

We overrule Heredia's second point of error.

**Evidence admissibility**

During trial, the State offered into evidence State's Exhibit 138C, approximately thirty pages of Heredia's internet search history, recovered from his phone, between the dates of June 19 and 26, 2016. The history included numerous searches for pornographic material and "escort" services. Heredia objected to this evidence as not relevant, *see* Tex. R. Evid. 401, impermissible character evidence, *see id*. R. 404(b), and more prejudicial than probative, *see id*.

15

R. 403. The district court overruled the objections. In his third point of error, Heredia argues that the district court abused its discretion in admitting this evidence.[2]

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016); *Sandoval v. State*, 409 S.W.3d 259, 297 (Tex. App.—Austin 2013, no pet.). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). Further, we may not reverse the trial court's ruling unless it "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93; *Sandoval*, 409 S.W.3d at 297.

Rule 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action." Tex. R. Evid. 401. This was a homicide case in which the defendant admitted to shooting the victim. Thus, the sole issue at trial was whether Heredia shot Rivers intentionally, knowingly, recklessly, or negligently. The State did not allege that Heredia had sexually assaulted the victim or committed any sexual offense against her. We have reviewed

---

[2] The State asserts that Heredia waived this point of error because he did not "particularly object to the particular parts of the admitted evidence he now raises as objectionable on appeal." *See Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995) ("When an exhibit contains both admissible and inadmissible evidence, the objection must specifically refer to the challenged material to apprise the trial court of the exact objection."). We disagree. Heredia objected specifically to the references to pornographic material and escort services contained within the exhibit, and we conclude on this record that Heredia's objection was sufficiently specific to apprise the district court of the material within the exhibit that he found objectionable and to preserve this point for our review. *See* Tex. R. App. P. 33.1(a)(1)(A).

the evidence tending to show that Heredia searched for pornography and escorts in the days before the shooting. Some of the searches involved what could be fairly characterized as "violent" or "rough" pornography, and this evidence might have some marginal relevance to Heredia's state of mind at the time of the shooting. However, none of the searches involved shooting or killing women, and some of the searches were for incest, which had no conceivable relevance to the facts of this case. Additionally, none of the searches for escorts suggested any sort of violent mentality on the part of Heredia. Thus, most of the searches in State's Exhibit 138C were not relevant to any fact of consequence in this case, and it was outside the zone of reasonable disagreement for the district court to conclude otherwise.

Moreover, to the extent that the searches for "rough" pornography may have been marginally relevant, the district court should have excluded this evidence under Rule 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id*. R. 403. Factors to consider in the analysis include: (1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Reese v. State*, 33 S.W.3d 238, 240-41 (Tex. Crim. App. 2000).

The probative value of the evidence was weak because the searches did not relate in any way to the facts of the homicide offense for which Heredia was charged. Also, the titles of the searches were highly inflammatory and thus had significant potential to impress the jury in some irrational but indelible way. Although we agree with the State that the development of the evidence did not consume an inordinate amount of time at trial, it is also true that the State's

17

need for the evidence was low. The State had Griffin, an eyewitness, testify that Heredia pulled out a gun, pointed it at Rivers, and shot her in the back of the head, and the forensic evidence tended to support Griffin's version of events. Thus, the State already had evidence tending to show that Heredia intentionally shot Rivers. Moreover, to the extent that the State argues that it needed the evidence to establish Heredia's motive to kill Rivers, none of the searches suggested that Heredia wanted to shoot or kill anyone. Thus, the evidence did not assist the State in that regard. On this record, it was outside the zone of reasonable disagreement for the district court to find that the probative value of the evidence was not substantially outweighed by its prejudicial effect. Accordingly, we must conclude that the district court abused its discretion in admitting State's Exhibit 138C.

However, that does not end our inquiry. "The erroneous admission of evidence is non-constitutional error." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018) (citing *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008)). "Non-constitutional errors are harmful, and thus require reversal, only if they affect Appellant's substantial rights." *Id.* (citing Tex. R. App. P. 44.2(b)). The Court of Criminal Appeals has construed this to mean that "an error is reversible only when it has a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *Taylor*, 268 S.W.3d at 592). "If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction." *Id.*

In this case, as we have already explained, there was overwhelming evidence of Heredia's guilt, including his confession to the police that he shot Rivers. Moreover, the jury acquitted Heredia of murder and convicted him of manslaughter, which meant that the jury found that Heredia had recklessly caused Rivers's death. There is nothing in the record to suggest that

18

Heredia's internet search history is what caused the jury to find that he was reckless as opposed to some other mental state. Although the State discussed the internet search history in its closing argument, it focused on the other evidence in the case, including the eyewitness testimony, the forensic evidence, Heredia's familiarity with firearms, and the testimony of the other witnesses who had knowledge of the events before and after the shooting. On this record, we have a fair assurance that the error in admitting the evidence did not influence the jury or had but a slight effect. Accordingly, we cannot conclude that Heredia was harmed by its admission.

We overrule Heredia's third point of error.

**Deadly weapon finding**

In his fourth point of error, Heredia asserts that his judgment of conviction contains an improper finding that a deadly weapon was used in the commission of the offense. According to Heredia, the jury never made an affirmative deadly weapon finding.

The term "affirmative finding" means the trier of fact's express determination that a deadly weapon was actually used or exhibited during the commission of the offense. *Polk v. State*, 693 S.W.2d 391, 393 (Tex. Crim. App. 1985). "An affirmative deadly weapon finding must be an 'express' determination in order to be effective." *Guthrie–Nail v. State*, 506 S.W.3d 1, 4 (Tex. Crim. App. 2015). In other words, "[c]ourts do not look to the facts of the case to 'imply' an affirmative deadly-weapon finding; we look to the charging instrument, the jury charge, and the jury verdict to evaluate the propriety of an entry of a deadly-weapon finding in the judgment." *Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016). Accordingly, the jury makes an express deadly weapon finding when:

(1) the indictment specifically alleged that a deadly weapon was used (using the

19

words "deadly weapon") and the defendant was found guilty "as charged in the indictment";

(2) the indictment did not use the words 'deadly weapon' but alleged the use of a deadly weapon per se (such as a firearm); or

(3) the jury affirmatively answered a special issue regarding the use of a deadly weapon.

*Id.* (citing *Polk*, 693 S.W.2d at 396). Additionally, if the jury finds a defendant guilty of a lesser-included offense based upon an application paragraph that explicitly and expressly requires the jury to find that the defendant used a deadly weapon (or a deadly weapon per se) in the commission of the offense, then an affirmative deadly weapon finding in the judgment is authorized. *See Lafleur v. State*, 106 S.W.3d 91, 98 (Tex. Crim. App. 2003).

Here, the indictment alleged that Heredia "did then and there intentionally or knowingly cause the death of an individual, to-wit: Jennifer 'Gigi' Rivers, by shooting the said Jennifer 'Gigi' Rivers with a firearm." Although the jury acquitted Heredia of murder, it found him guilty of the lesser-included offense of manslaughter. The application paragraph of the manslaughter charge provided that if the jury believed beyond a reasonable doubt that Heredia "did then and there, recklessly cause the death of Jennifer 'Gigi' Rivers by shooting her with a firearm," then it shall find Heredia guilty of manslaughter and "so say by its verdict." Because a firearm is a deadly weapon per se, *see* Tex. Penal Code § 1.07(a)(17)(A), the jury necessarily made an express deadly weapon finding when it found by its verdict that Heredia was guilty of manslaughter, *see Lafleur*, 106 S.W.3d at 99; *see also Polk*, 693 S.W.2d at 394 (observing that in some cases "an affirmative finding will arise as a matter of law. If the trier of fact finds that a pistol has been used in the commission of the offense . . . , then it has found that a deadly

20

weapon has been used since a pistol is a deadly weapon per se"). Accordingly, the district court did not err in including a deadly weapon finding in Heredia's judgment of conviction.

We overrule Heredia's fourth point of error.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Triana, and Smith

Affirmed

Filed: November 19, 2020

Do Not Publish