Dagmar Fehrmann GAHAGAN, Appellant

v.

The STATE of Texas, Appellee.

No. 01–06–00062–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 27, 2007.

---

Edwin Dee McWilliams, Wendell Odom, Houston, for Appellant.

Charles A. Rosenthal, Jr., Dist. Atty., Jessica A. Caird, Asst. Dist. Atty., Houston, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

JANE BLAND, Justice.

After an incident that resulted in the death of Dennis Edwards, appellant Dagmar Gahagan was charged with and tried for murder. At the close of evidence, the jury was asked to determine whether the State had proven beyond a reasonable doubt that Gahagan committed either murder or the lesser included offense of manslaughter. The jury found Gahagan guilty of manslaughter and assessed a sentence of five years' imprisonment. TEX. PEN. CODE ANN. § 19.04(a) (Vernon 2003). Following her conviction, Gahagan noticed this appeal.

Gahagan contends that her conviction must be reversed because (1) the evidence was legally and factually insufficient to support the jury's verdict; (2) the trial court erred in submitting an instruction on manslaughter to the jury; and (3) the trial court abused its discretion in denying her motion for new trial due to jury misconduct. Finding no error, we affirm.

## Background

Gahagan and Edwards' sister, Scarlet Robinson, met in 2002 as neighbors at an apartment complex in Houston. They became friendly with each other and occasionally visited or went shopping or to church together.

Edwards met Gahagan through Robinson shortly after he moved to Houston. Robinson had invited Edwards to Houston so that she could help him overcome his drinking problem. He had just divorced his wife of 25 years and "was in a really bad place." Robinson helped her brother regain his health and find a job.

Edwards and Gahagan began meeting at the apartment complex pool and going out for meals or to nightclubs. As he spent time with Gahagan, Edwards began drinking again. As Gahagan and Edwards spent more time together, Gahagan began complaining to Robinson about Edwards' behavior. Robinson reminded Gahagan about her brother's problem with alcohol and expressed concern about his relapse. Despite Gahagan's complaints, she continued to go out with Edwards. She also loaned or gave him money from time to time, and gave him a cross on a gold chain as a gift.

Gahagan also gave Edwards one of her two guns, a snub-nosed revolver that she found too difficult to handle. Gahagan testified that she owned the guns, which she kept for self-defense, when she moved into her apartment in 1999. The gun she kept was a Lady Smith & Wesson revolver that she had received as a gift from her fourth ex-husband.

By all accounts, Gahagan's relationship with Edwards was a rocky one. According to Gahagan, their difficulties stemmed mostly from their difference of opinion on the closeness of their relationship. She claimed that Edwards would try to pres-

sure her into having a more serious relationship. Occasionally, Gahagan and Edwards went for days or weeks without seeing or speaking with each other.

After several months in Houston, Edwards decided to return to Florida. When he told Gahagan about his plans, she threatened to kill him. Edwards mentioned the threat to his sister, and she confronted Gahagan about it. Gahagan admitted to Robinson that she had made the threat to Edwards, but explained that she had used the term as a figure of speech and assured Robinson that she would never follow through on it.

After Edwards spent a couple of months in Florida, his Houston employer called to tell him that his old job was still open and asked him to return. Shortly after Edwards returned to Houston, he and Gahagan resumed their relationship.

In early July 2004, Edwards asked Gahagan for a $1,000 loan to help him pay alimony and rent. Gahagan issued Edwards an ultimatum: either take the $1,000 or stay in the relationship with her. Edwards looked at her for a moment, then put the money in his pocket and left. Edwards' daughter testified that, during the same time frame, Gahagan questioned her extensively about Edwards, and her father indicated he was concerned about his personal safety around Gahagan.

The evening of July 22, 2004, Edwards went to Gahagan's apartment and presented her with a sealed envelope containing a handwritten letter expressing his disappointment with her behavior of late and his inability to trust her. The letter also stated that he had decided to end their relationship. Gahagan brought the letter into the kitchen and stood at the kitchen counter while Edwards sat on a bar stool across the counter from her. She testified that she opened the envelope and began to read the letter, but set it down when Ed-

wards asked her not to read it then. According to Gahagan, she did not read the letter or have any knowledge of its contents until shortly before her trial.

Following this exchange, Gahagan testified, she and Edwards discussed a series of criminal incidents that had occurred at the apartment complex. Gahagan discussed her safety concerns with Edwards and that the pinched nerve, carpal tunnel syndrome, and arthritis she had in her hands made it difficult for her to handle her gun. Gahagan explained that Edwards had trouble understanding her description of the problem and asked her to demonstrate. Gahagan retrieved the gun from her nightstand, opened the cylinder, pushed on the ejector, and unloaded the bullets into her hand. She did not, however, check to see whether the cylinder was empty or count how many bullets had dropped out. Then, Gahagan returned to the main living area and walked back to the kitchen counter across from the bar where Edwards was sitting.

Gahagan described her next actions as follows:

Q: Were you paying any attention to where you were pointing the gun? Were you conscious of where you were pointing the gun?

A: In Dennis' direction, yes.

\* \* \*

Q: Do you know where your forefinger was?

A: At the trigger.

\* \* \*

Q: Do you know, can you tell the ladies and gentlemen what your thumb was doing?

A: It was pulling the hammer back.[1]

While Gahagan was pulling the hammer back, she testified, the gun suddenly and unexpectedly discharged. Edwards, still in the bar stool, slumped over, dropping his head onto his hands, which were resting on the bar.

At first, Gahagan thought he was joking, but then realized that the gun had actually discharged. After making this realization, she opened the cylinder, took the casing out of the gun, returned to her nightstand, placed the casing in the gun case, and zipped the case shut. She admitted that she did so to "get rid of [the casing] ..." because "[i]t wasn't supposed to be in the gun."

While still by the nightstand, Gahagan also called 911. Gahagan told the 911 operator that both she and Edwards had held the gun, but conceded in her testimony that Edwards did not hold the gun either before or during the shooting. The 911 recording also revealed that Gahagan refused to perform CPR, locate the wound, or try to render any aid to Edwards. At trial, she explained that she refused to do so because he "was bleeding badly" and had "lost too much blood to be still alive."

After completing the call, Gahagan returned to the bar area where Edwards' body was and placed the gun, with the cylinder still open, in his hand. When asked why she did this, Gahagan claimed that it was a "mistake ... [an] unexplainable reaction to ... being in shock." Gahagan also testified that she became physically ill after seeing Edwards' condition and washed her hands and face to clean herself before the paramedics and police arrived.

When the paramedics arrived, they found that Edwards had already died.

The police arrived shortly after the paramedics. In their investigation of the apartment, they discovered Edwards' letter to Gahagan opened to the second page and the empty shell Gahagan had placed inside the closed gun case in the nightstand. They also tested Gahagan's hands for gunshot residue, but were unable to obtain enough material to yield a conclusive result.

The coroner determined that Edwards died from the gunshot wound. The coroner's examination revealed that the bullet entered on the right side of Edwards' lower lip and traveled to the back of his body at a horizontal angle until it lodged in his upper spine. The coroner testified that the lack of any contact wound or stippling indicated that the gun's muzzle was at least one and a half feet from Edwards when it was fired.

An examiner from the Houston Police Department crime lab did not locate any full or partial fingerprints on the gun, casing, or bullets. Moreover, evidence from the firearms lab showed that the safeties on the gun worked and would have prevented an accidental discharge. The State's witness from the firearms lab demonstrated for the jury that the gun would not fire unless someone pulled the trigger. Gahagan's firearms expert likewise testified that the safeties on the gun functioned properly and that the gun would not fire without pulling the trigger "all the way back."

Gahagan has significant experience with firearms. Gahagan's fourth ex-husband testified that Gahagan had accompanied him to the firing range for practice approximately once every two weeks for a five-year period and occasionally at other times during their fifteen-year marriage.

---

1. At the same time, Gahagan also testified that she was "not paying a lot of attention" as to how she held the gun or where she pointed it.

According to her ex-husband, Gahagan could hit a target and knew her physical limitations with a gun. Gahagan conceded that she knew never to point a weapon at anyone whether it was loaded or not, and that she could have demonstrated her problem in handling the gun without pointing it at Edwards.

At the same time, the evidence shows that Gahagan had some difficulty handling a gun. The pinched nerve, carpal tunnel syndrome, and arthritis in her hands cause her to suffer numerous physical symptoms, including a loss of fine motor skills, numbness, tingling, and weakness in the thumb, index, and middle fingers. Gahagan's ex-husband explained that "one of the reasons that we would go [to the shooting range] is, was to see that she could still handle the weapon. Her arthritis in her hand had gotten worse over the years and we wanted to make sure she could still handle it safely." Her symptoms "waxed and waned," however, and the record does not reveal the extent of her impairment on the day of the incident.

Gahagan's firearms expert also testified in support of Gahagan's claim that the gun discharged inadvertently. He explained that the firing pin impression on the cartridge that had contained the fatal bullet was "very, very light," which was consistent with an accidental discharge of the weapon. He conceded, however, that the gun could not fire without pulling the trigger all the way back and an inadvertent discharge was only one of many possible explanations for a light firing pin impression.

## Discussion

### A. Sufficiency of Evidence in Support of Manslaughter Conviction

#### 1. Standards of Review

We apply two distinct standards in addressing Gahagan's challenges to the sufficiency of the evidence. In reviewing the legal sufficiency challenge, we view the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the crime's essential elements beyond a reasonable doubt. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex.Crim.App.2000); *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App.2000). We may not re-weigh the evidence and substitute our judgment for that of the fact finder. *King*, 29 S.W.3d at 562.

In reviewing the factual sufficiency challenge, we view the evidence in a neutral light. *Ladd v. State*, 3 S.W.3d 547, 557 (Tex.Crim.App.1999). We will set aside the verdict only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000). We may not conclude that the evidence is factually insufficient simply because we disagree with the verdict. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App.2006). As the determiner of the credibility of the witnesses, the fact finder may choose to believe all, some, or none of the testimony presented. *Cain v. State*, 958 S.W.2d 404, 407 n. 5 (Tex.Crim.App.1997).

#### 2. Manslaughter

A person commits manslaughter if she recklessly causes the death of an individual. TEX. PEN.CODE ANN. § 19.04(a) (Vernon 2003). A person acts recklessly with respect to circumstances surrounding her conduct or the result of her conduct when she is aware of, but consciously disregards, a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(c) (Vernon 2003). The risk must be of such a nature and degree that its disregard constitutes a

gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actor's standpoint. *Id.; Garza v. State,* 50 S.W.3d 559, 564 (Tex.App.-Houston [1st Dist.] 2001, no pet.). "At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct." *Lewis v. State,* 529 S.W.2d 550, 553 (Tex. Crim.App.1975).

▆▆▆ The gist of Gahagan's legal and factual sufficiency challenges concerns whether the evidence supports the jury's finding of recklessness, the level of intent required to support a manslaughter conviction. Proof of a culpable mental state generally relies on circumstantial evidence. *Dillon v. State,* 574 S.W.2d 92, 94 (Tex. Crim.App.1978). Whether the accused is actually aware of a risk or simply should be aware of it is for the jury to determine based on all the circumstances it accepts as proven. *Id.* The issue, then, is whether, in light of all the circumstances, a rational trier of fact could infer that Gahagan was aware of the risk created by her conduct.

▆▆▆ In determining whether the evidence supports a finding of recklessness, a statement that a defendant did not intend to kill the victim "cannot be plucked out of the record and examined in a vacuum." *Godsey v. State,* 719 S.W.2d 578, 584 (Tex.Crim.App.1986); *Martinez v. State,* 16 S.W.3d 845, 847 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd). Courts have upheld jury findings that a defendant consciously disregarded a substantial and unjustifiable risk in numerous situations involving allegedly accidental discharge of a firearm. *See, e.g., Guzman v. State,* 188 S.W.3d 185, 193–94 (Tex.Crim. App.2006) (rejecting appellant's argument that, because he thought gun was unloaded after he had removed clip, he did not actually consciously disregard known risk; appellant testified that he was fully aware

of fact that pointing gun at someone's head and pulling trigger is very dangerous act, constituting admission that he had reckless state of mind); *Lugo v. State,* 667 S.W.2d 144, 149 (Tex.Crim.App. 1984) (concluding that jury could have reasonably found defendant consciously disregarded substantial and unjustifiable risk based on his testimony that he was unaware rifle was loaded when he cocked and pointed rifle at victim in attempt to persuade her to relinquish car keys); *Hayes v. State,* 124 S.W.3d 781, 788 (Tex. App.-Houston [1st Dist.] 2003) (holding evidence was legally and factually sufficient for jury to find defendant was reckless on showing that defendant held gun he knew was loaded in non-dominant hand, pointed gun toward victims, closed his eyes, and began shooting), *aff'd,* 161 S.W.3d 507 (Tex.Crim.App.2005); *In re E.U.M.,* 108 S.W.3d 368, 371 (Tex.App.-Beaumont 2003, no pet.) (holding that evidence was legally sufficient for jury to find that juvenile engaged in conscious risk creation even if he mistakenly thought that shell was not in chamber and gun would not discharge when he pulled trigger); *Davis v. State,* 757 S.W.2d 386 (Tex.App.-Dallas 1988, no pet.) (affirming manslaughter conviction for defendant who alleged he was just playing with gun, did not know it was loaded, and that it accidentally discharged); *Yates v. State,* 624 S.W.2d 816, 817 (Tex.App.-Houston [14th Dist.] 1981, no pet.) (affirming manslaughter conviction for defendant who, after killing victim in "quick-draw" contest, admitted to knowingly pointing loaded gun at victim but claimed that it accidentally discharged); *Daniels v. State,* No. 01–93–00485–CR, 1994 WL 150900, *2–3 (Tex. App.-Houston [1st Dist.] Apr. 28, 1994, pet. ref'd) (not designated for publication) (affirming manslaughter conviction of defendant who claimed he shot wife acciden-

tally because he did not know gun was loaded; evidence showed that defendant was familiar with guns and jury could reasonably find that defendant knew gun was loaded because examination of weapon showed that bullets were visible when placed inside and there was expert testimony that gun could not discharge accidentally).

Gahagan relies on *Thomas v. State*, 699 S.W.2d 845 (Tex.Crim.App.1985), and *Branham v. State*, 583 S.W.2d 782 (Tex. Crim.App.1979), to contend that the evidence is legally insufficient to convict her of manslaughter.[2] But *Thomas* supports upholding the verdict in this case. There, as here, the defendant claimed that the gun accidentally charged. The Court observed, however, that the analysis of whether the defendant's culpable mental state amounted to recklessness or criminal negligence requires consideration of all the evidence, not just whether the defendant pointed a loaded gun at the victim and whether the weapon accidentally discharged. *Thomas*, 699 S.W.2d at 849. Thus, evidence that a defendant is familiar with guns and their potential for injury

and that the defendant pointed the gun at the victim "indicates a person who is aware of a risk created by that conduct and disregards the risk."[3] *Id.* at 850.

The facts in *Branham* are distinguishable. The defendant in that case, who had never handled a gun before the incident that resulted in the victim's death, testified that the gun accidentally discharged when "somebody from behind grabbed [her]." *Branham*, 583 S.W.2d at 784 (quoting defendant's testimony). Under those circumstances, the court concluded that the trial court erred in failing to charge the jury on criminally negligent homicide. *Id.* at 785.

*Davis* most closely resembles the circumstances presented here. 757 S.W.2d at 387–88. The appellant testified that, while sitting in his truck with his girlfriend, he picked up a gun he kept in the beer holder and began "playing with" the gun and spinning it on his index finger. *Id.* at 387. The gun discharged, striking his girlfriend between the eyes and killing her. *Id.* The appellant explained that he did not know the gun was loaded. *Id.* Nevertheless, the

2. We note that, in each of these cases, the defendant claimed error because the trial court refused to submit to the jury the defendant's requested charge on criminally negligent homicide. *See Thomas v. State*, 699 S.W.2d 845, 847 (Tex.Crim.App.1985); *Branham v. State*, 583 S.W.2d 782 (Tex.Crim.App. 1979). In contrast to the standard of review for factual sufficiency, which requires deference to the credibility determinations of the fact finder and entails comparison of the evidence which tends to prove the existence of the disputed elements to the evidence which tends to disprove it, the standard for reviewing a claim of whether a defendant is entitled to a lesser included offense instruction requires only that the record contain some evidence, regardless of its weakness or strength, that would permit a jury to rationally find that, if the defendant was guilty, she was guilty only of the lesser offense. *Compare Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.

App.2000) *and Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App.2006) (factual sufficiency) *with Saunders v. State*, 840 S.W.2d 390, 391 (Tex.Crim.App.1992) (propriety of including instruction on lesser included offense). This substantial difference in the standard of review makes these cases of limited utility in analyzing Gahagan's legal and factual sufficiency challenges.

3. Evidence that the defendant in *Thomas* was aware the weapon was loaded, whereas here, Gahagan testified that she mistakenly thought the gun was unloaded, is not a material distinction under the facts presented. Gahagan admittedly knew not to point a gun, whether loaded or unloaded, in anyone's direction. This admission supports a reasonable inference that Gahagan perceived the risk of harm that her conduct created. *See Moore v. State*, 574 S.W.2d 122, 123 (Tex.Crim.App.1978).

jury found that he had committed manslaughter. *Id.*

On appeal, the appellant contended that there was no evidence that he (1) knew the gun was actually loaded, or (2) purposefully pointed the gun at the victim. At most, he asserted, the evidence supported a finding only that he acted with criminal negligence. *Id.*

The court of appeals rejected this assertion. *Id.* at 388. Pointing to the appellant's admission that he understood the risk involved with handling a handgun with another person in his immediate vicinity, the court held that this evidence provided sufficient support for the jury's finding that the appellant was aware of and consciously disregarded the risk involved in handling the gun around the victim. *Id.* The *Davis* court observed that "that the precise circumstances of a death very commonly surface only in the testimony of the survivor who, if he be governed by the forces of human nature, will be wont to cast his testimony in a light most favorable to himself." *Id.*

The record in this case shows that Gahagan, like the appellant in *Davis*, was familiar with guns and knew the risks involved in handling them. Further, although some of her testimony equivocated on the issue, Gahagan admitted that she was aware that she was pointing the gun in Edwards' direction. She also conceded that she knew from her experience in handling guns that one should never point a gun at anyone whether it is loaded or not. The record also contains conflicting evidence from the firearms experts concerning whether the gun could have accidentally discharged as Gahagan claimed. A reasonable jury could have chosen to disbelieve any or all of Gahagan's benign description of the incident and instead put stock in the circumstantial evidence surrounding the incident—such as Gahagan's familiarity with

guns and her actions immediately following the shooting—which supports a reasonable inference that Gahagan was conscious of the risk created by her actions. *See Conroy v. State,* 843 S.W.2d 67, 70 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd) (trier of fact may use any of facts in evidence which prove existence of requisite intent); *Yates,* 624 S.W.2d at 817 (observing that testimony from investigative detective that trigger was type that would discharge only with deliberate pull conflicted with appellant's claim that gun accidentally discharged and supported manslaughter conviction); *see also In re E.U.M,* 108 S.W.3d at 371 (observing that juvenile's attempt to shift responsibility in changing story about circumstances of homicide indicated that she acted with guilty knowledge and supported recklessness finding); *Davis,* 757 S.W.2d at 387 (defendant initially concealed gun, victim's body, and clothing, disclosing whereabouts only after police interrogation). Accordingly, we conclude that the evidence is legally and factually sufficient to support the manslaughter conviction.

## B. Submitting Manslaughter to the Jury as a Lesser Included Offense

 Gahagan also claims that the trial court erred in submitting the lesser included offense of manslaughter as requested by the State. "When reviewing charge errors, an appellate court must undertake a two-step review: first, the court must determine whether error actually exists in the charge, and second, the court must determine whether sufficient harm resulted from the error to require reversal." *Abdnor v. State,* 871 S.W.2d 726, 731–32 (Tex.Crim.App.1994). A party is entitled to a lesser included charge when (1) it is a lesser included offense of the offense charged in the indictment, and (2) the record includes some evidence to per-

mit a rational jury to find that, if the defendant was guilty, she was guilty only of the lesser offense but not guilty of the greater. *See McKinney v. State*, 207 S.W.3d 366, 370 (Tex.Crim.App.2006); *Guzman v. State*, 188 S.W.3d 185, 188 (Tex.Crim.App.2006); *Salinas v. State*, 163 S.W.3d 734, 741 (Tex.Crim.App.2005).

Manslaughter is a lesser included offense of murder. *McKinney*, 207 S.W.3d at 370; *Moore v. State*, 969 S.W.2d 4, 10 (Tex.Crim.App.1998); *see* TEX.CODE CRIM. PROC. ANN. art. 37.09(3) (Vernon 2006). Gahagan challenges only the trial court's conclusion that the evidence presented satisfied the second prong, asserting that the evidence did not support submission of the charge.

Evidence that Gahagan was experienced in handling firearms, knew her own physical limitations, and was aware she was pointing the gun in Edwards' direction when it accidentally discharged would permit a jury rationally to find that appellant was guilty only of manslaughter as the lesser included offense of the murder alleged in the indictment. The issue of whether the evidence might, as Gahagan contends, permit a finding of criminal negligence—a finding that Gahagan did not ask the jury to make—has no bearing on that conclusion. *See Conroy*, 843 S.W.2d at 71–72 (holding that trial court erred in failing to include defendant's requested instruction on criminally negligent homicide in jury charge while also concluding that jury could have rationally found appellant was aware of risk of death associated with his actions, that risk was substantial and unjustifiable, and that he consciously disregarded risk). Accordingly, the trial court did not err in submitting the charge on manslaughter. *See Hampton v. State*, 109 S.W.3d 437, 440 (Tex.Crim.App.2003).

## C. *Jury Misconduct*

In her final issue, Gahagan seeks reversal of her conviction on the claim that the jury engaged in misconduct by receiving "other evidence" after retiring to deliberate. Specifically, Gahagan, through counsel, averred that one of the jurors volunteered that, while he was initially inclined to vote "not guilty," he changed his mind after the jurors experimented with the gun in evidence and tested the gun's operation. The trial court's order indicates that it considered the proffered evidence and argument in her amended motion concerning this issue before denying her request for new trial.

To be entitled to a new trial based on Rule 23 of the Texas Rules of Appellate Procedure, the defendant must show that the jury actually received "other evidence" that harmed her defense. TEX.R.APP. P. 23; *Bennett v. State*, 742 S.W.2d 664, 676 (Tex.Crim.App.1987), *vacated on other grounds*, 486 U.S. 1051, 108 S.Ct. 2815, 100 L.Ed.2d 917 (1988); *Guice v. State*, 900 S.W.2d 387, 389 (Tex.App.-Texarkana 1995, pet. ref'd). We review the trial court's decision to deny Gahagan's motion for new trial on this ground for an abuse of discretion. *See Lewis v. State*, 911 S.W.2d 1, 7 (Tex.Crim.App.1995).

Texas Rule of Evidence 606(b) provides that, "[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." TEX.R. EVID. 606(b). The rule, however, allows a juror (1) to testify about "whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve." *Id.* In short, a new trial is war-

ranted only when "other evidence" involved in the alleged jury misconduct is an influence external to both the jury and the deliberations brought to bear on a juror. *See Kendall v. Whataburger,* 759 S.W.2d 751, 755 (Tex.App.-Houston [1st Dist.] 1988, no writ). The issue, then, is whether the jury's alleged experimentation with the gun in evidence constitutes an external influence.

The Texarkana court of appeals ably summarized the law applicable to this issue as follows:

> Generally it is improper for jurors to conduct experiments or demonstrations in the jury room after beginning deliberations. Jurors may, however, in discussing the evidence among themselves, arrive at an understanding of the evidence by movements of their own bodies or by use of articles admitted in evidence which are taken with them. A conscious and contrived experiment that does not come from the witness stand deprives the accused of the right of cross-examination or counsel, but not every demonstration requires the court to grant a new trial. A reviewing court need not grant a new trial absent a showing that the jurors during the experiment discovered and were influenced by some *new* fact hurtful to the appellant. Whether the jurors received new and harmful evidence during their deliberations is a fact issue to be decided by the trial court and a question of degree.

*Guice,* 900 S.W.2d at 389 (citations omitted) (emphasis in original).

The juror's statement, as relayed by defense counsel, is too vague to demonstrate that any outside influence affected the juror, or that the jurors did anything more than examine an admitted exhibit more closely so as to apply information learned at trial.[4] The trial court acted within its discretion in denying Gahagan's motion for new trial.

## Conclusion

We conclude that legally and factually sufficient evidence supported the verdict and that the trial court did not err in charging the jury or in denying a new trial. We therefore affirm the judgment of the trial court.

---

4. The State also challenges the competence of Gahagan's evidence of alleged juror misconduct and the timeliness of her motion for new trial. Our disposition makes it unnecessary for us to reach these issues.