

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

───────────────────────

No. 02-24-00281-CR

───────────────────────

BRAVION DERROUGH, Appellant

V.

THE STATE OF TEXAS, Appellee

───────────────────────────────────────────

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1759841

───────────────────────────────────────────

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

Appellant Bravion Derrough appeals his conviction for manslaughter for which he was sentenced to sixteen years in prison. *See* Tex. Penal Code Ann. § 19.04. In five points, Appellant argues that the trial court erred by (1) refusing to give an instruction under Texas Penal Code Section 6.01 on voluntariness, (2) admitting evidence in violation of various notice requirements, (3) admitting an extraneous offense, and (4) refusing to give a limiting instruction and that (5) the evidence is insufficient to show that he acted with recklessness. Because we hold that sufficient evidence supports Appellant's conviction, that the evidence did not warrant an instruction under Section 6.01, that Appellant did not move for a mistrial to preserve his lack-of-notice argument, and that Appellant was not harmed by the admission of the extraneous-offense evidence or the refusal to give a limiting instruction as to the extraneous-offense evidence, we affirm.

### II. Background

The victim, Ashanti Foremar, met Appellant in high school, and they dated off and on for approximately four years. The record showed that the victim and Appellant had a good relationship, despite being "on and off" sometimes.

Dekedrick Smith testified that he and Appellant were close friends. A couple of days prior to the victim's death, Smith and Appellant went to shoot the gun that

was used during the shooting that is at issue; during that outing, Appellant talked about the gun's features and said that it had a light trigger and that it had a safety.

Smith testified that he and his girlfriend spent almost every night together with the victim and Appellant. On September 9, 2022—the night of the incident—the four of them were at a vacant apartment in Fort Worth. Appellant had brought the gun to the apartment, and it was sitting out on the bar top next to the kitchen.

Smith testified that after they ate dinner, he and the victim were standing in the kitchen talking and smoking marijuana while his girlfriend was in the bathroom. Appellant "went to go pick up the gun and take it to the [bed]room[,] and it went off. Soon as -- soon as he grabbed the gun and took a step, it went off." Later, Smith testified that Appellant had "[t]ried to pick it up and it [had] shot off. I mean, he shot off and he dropped it." According to Smith, Appellant had tried to pick up the gun with one hand.

Smith said that Appellant was in shock, was scared, and was crying. Smith did not realize that the victim had been shot until she fell on the floor; he and Appellant moved her by her shoulders and saw that she had been shot in the left ear. Smith left the scene on foot because he was on probation and was not supposed to be around guns.

A video from the outside of the apartment showed Appellant running into the parking lot, yelling for Smith, and telling Smith's girlfriend to bring her phone. She came out and gave him her phone. Appellant told Smith's girlfriend, "I accidentally

3

shot her." Smith's girlfriend remained with Appellant while he called 911 and stayed in the parking lot until the police arrived.

The custodian of records for the City of Fort Worth testified that two 911 calls were received on September 9, 2022—one at 9:13 p.m. and one at 9:23 p.m. A recording of the calls was admitted into evidence. During the first call, Appellant reported that someone had come to the apartment and had tried to shoot at him but had hit his girlfriend. During the second call, Appellant reported, "She's been shot in the head . . . . The gun went off."

Fort Worth Police Officer Travis Kendrick responded to the call that a female had been shot. He saw Appellant outside the gates of the apartment complex and spoke with him; Appellant was crying. Appellant said that his girlfriend had been shot and took Officer Kendrick to her. Officer Kendrick found the victim deceased on the floor inside the apartment. Officer Kendrick asked Appellant if the shooting was accidental, and he said, "[A]ll I did was move it [the gun.]" Officer Kendrick could not find the gun or the casing from the bullet that was fired.

When Fort Worth Police Officer Daniel Wagner arrived on the scene, Officer Kendrick gave him a description of Appellant and directed him to find Appellant and stay with him. Officer Wagner located Appellant and asked him where the gun was. Appellant took Officer Wagner to a drainage ditch near the parking lot, and Officer Wagner found the gun in a black backpack. During the hour that Officer Wagner spent keeping an eye on Appellant, Appellant said that it was an accident—that he

4

had picked up the gun and that it had gone off. Appellant also said that he had put the gun in the backpack and had thrown it.[1]

FWPD Crime-Scene Officer Dana Atkins took photos to document the scene and documented red stains on Appellant's hands. Officer Atkins collected the backpack in which she found a blanket that enclosed a fired casing and a gun—a PAK-9, 9-millimeter Luger.[2]

The State's expert, a forensic firearm and toolmark examiner with the Tarrant County Medical Examiner's Office, performed a function test on the PAK-9 gun and testified that it functioned the way it was designed. He noted that the gun had two fully functioning safety features—a manual safety and a disconnect safety, which prevented the firearm from firing in full automatic. When he tested the trigger's functioning, he said that the average force that was required to pull the trigger was "about 2.7 pounds." When asked if the gun had a light trigger, the expert stated that it felt "normal" to him for that type of firearm. When asked about the gun's weight, he said, "Pistol-wise, this is heavier than normal." The State also asked about whether the weapon would discharge on its own:

> Q. [D]uring your examination or testing of this weapon, did this weapon ever discharge without you[r] pulling the trigger?

---

[1]According to Smith, his girlfriend had put the gun in Appellant's backpack and had taken it downstairs; Smith's girlfriend testified at trial and denied disposing of the gun.

[2]The record revealed that the design of the gun was not typical for a semiautomatic pistol but was more in line with an AK-47 design.

A. No.

Q. Would this weapon, after your testing from what you saw, would this weapon go off without pulling that trigger?

A. The only time that this firearm would fire during my examination was if it was loaded and the safety was off and you pulled the trigger.

On cross-examination, the defense asked if the expert had ever heard of a firearm going off accidentally without someone pulling the trigger, and he answered affirmatively. But when defense counsel further inquired whether there was "[a]ny way to know for sure that that didn't happen in this case," the expert responded, "Based on the testing that I did, there's no indication . . . that [this gun] will discharge without pulling the trigger."

On redirect examination, the expert was asked about precautions to use with firearms and stated, "The number one rule is just assume that every firearm is loaded.[3] Never point the firearm at something that you do not intend to destroy." When asked on recross-examination whether it would be negligent if someone did not follow those rules, the expert answered affirmatively.

The deputy medical examiner who conducted the autopsy testified that the cause of the victim's death was a gunshot wound to the head and that the manner of

---

[3]The evidence revealed that Appellant had brought the gun to the apartment and that when it was found after the shooting, it had nine cartridges loaded in its magazine in addition to a bullet in the chamber.

her death was homicide. He stated that it can be inherently dangerous to point a firearm at a human being if the gun is loaded.

Officer Jose T. Palomares testified that approximately four months prior to the shooting, he had encountered a group of people walking down the street around 3:30 a.m. Appellant was part of that group and had in his possession a Glock handgun with a 50-round magazine at the bottom.

After hearing the evidence, the jury found Appellant guilty of manslaughter. The jury also heard punishment evidence and assessed Appellant's punishment at sixteen years' confinement and a $5,000 fine. The trial court rendered judgment on the jury's verdicts. Appellant filed a motion for new trial and later an amended motion, which was overruled by operation of law. This appeal followed.

### III. Sufficient Evidence of Recklessness

In his fifth point, Appellant argues that the evidence is insufficient to prove the recklessness element of manslaughter.[4] Appellant contends that "[t]he circumstances of [his] picking up a loaded gun that also had a light trigger to put it away[] in an effort to *avoid* any danger of it being out on the counter failed to substantiate criminal recklessness." Case law, however, requires us to hold that Appellant's act of picking up the gun with one hand while someone was in front of the gun was reckless.

---

[4]We address a sufficiency issue first because, in the event it is meritorious, we would render a judgment of acquittal rather than reverse and remand. *Sanders v. State*, No. 05-22-01376-CR, 2024 WL 725529, at *1 (Tex. App.—Dallas Feb. 22, 2024, no pet.) (mem. op., not designated for publication).

7

**A.      Standard of Review**

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021).

## B. Applicable Law

A person commits the offense of manslaughter if he recklessly causes the death of an individual. Tex. Penal Code Ann. § 19.04(a). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* "By its nature, a culpable mental state must generally be inferred from the circumstances," including the

9

accused's "acts, words, and conduct." *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018). A jury may infer recklessness from the mishandling of a firearm; specifically,

> a jury may infer recklessness from evidence that a defendant was familiar with firearms and pointed a firearm in the victim's direction, even if the defendant claimed not to know that the firearm was loaded. . . . This is because firearms are "dangerous instrumentalities," and their "very purpose is to kill or injure should the necessity arise." *Sadler v. State*, 728 S.W.2d 829, 832 (Tex. App.—Dallas 1987, no pet.)[ (op. on reh'g)]. Thus, "[i]t is mandatory that they be handled at all times with great care[,] and the failure to do so may be legitimately viewed by the trier of . . . fact as 'a gross deviation from the standard of care that an ordinary person would exercise . . . .'" *Id.* (quoting Tex. Penal Code [Ann.] § 6.03(c)); *cf.* Tex. Penal Code [Ann.] § 22.05(c) (establishing presumption in deadly conduct statute that "[r]ecklessness and danger are presumed if the actor knowingly pointed a firearm at or in the direction of another whether or not the actor believed the firearm to be loaded").

*Heredia v. State*, No. 03-19-00311-CR, 2020 WL 6789092, at *4 (Tex. App.—Austin Nov. 19, 2020, pet. ref'd) (mem. op., not designated for publication).

Moreover, "[c]ourts have upheld jury findings that a defendant consciously disregarded a substantial and unjustifiable risk in numerous situations involving allegedly accidental discharge of a firearm." *Gahagan v. State*, 242 S.W.3d 80, 86 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (collecting cases). Furthermore,

> [e]vidence that a defendant was familiar with guns *and took actions after the shooting to conceal evidence* may support a reasonable inference that the defendant was conscious of the risk created by [his] actions. *See Gahagan*, 242 S.W.3d at 83–84, 88 (upholding manslaughter conviction when the defendant was familiar with guns although she testified that she had unloaded the gun before the accidental discharge; and after the shooting, she removed the casing from the gun and hid it, did not render aid to the

10

decedent, lied to police that the decedent had held the gun, placed the gun in the decedent's hand, and washed her hands and face before paramedics arrived).

*Kirkwood v. State*, Nos. 14-20-00107-CR, 14-20-00108-CR, 2021 WL 2656672, at *2 (Tex. App.—Houston [14th Dist.] June 29, 2021, no pet.) (mem. op., not designated for publication) (emphasis added).

### C.    Sufficiency Analysis

Here, the State presented evidence that Appellant was familiar with firearms, especially the one used during the shooting. Smith testified that just days prior to the incident, he and Appellant had gone shooting with the exact firearm. At that time, Appellant had remarked to Smith that the gun had a light trigger and that it had a safety—a safety that was not engaged on the day of the shooting. Because Appellant had shot the gun prior to the incident, he was familiar with the weight of the gun— i.e., it was heavier than similar pistols—and therefore knew better than to one-handedly grab the gun when he attempted to move it from the bar counter. Moreover, because the evidence showed that Appellant had brought the gun to the apartment, the jury could have inferred that Appellant knew that the gun was loaded and that the safety mechanism was not engaged and concluded that he disregarded those facts when he one-handedly grabbed the gun causing it to be pointed at the victim who was standing nearby. Appellant appears to claim that his positive relationship with the victim and good intent—to keep others safe by moving the gun

11

to the bedroom—overrides the manner in which he handled the gun.[5]  But Appellant cites no case showing that a good intent trumps picking up a heavy, loaded gun with one hand while the safety is not engaged (despite an allegedly light trigger) and while the gun is pointed in the direction of another person—i.e., a reckless manner. Instead, case law reveals that courts have upheld jury recklessness findings—i.e., that a defendant consciously disregarded a substantial and unjustifiable risk—in numerous situations involving accidental discharges of firearms.  *See Gahagan*, 242 S.W.3d at 86–87 (collecting cases).  Moreover, after the shooting, Appellant lied to the 911 operator, saying that someone had shot at him but had shot the victim instead; hid the gun and the spent casing in a backpack; and disposed of the backpack in a drainage ditch.

Because of Appellant's familiarity with the gun that was used to shoot the victim and because of the actions that he took after the shooting to conceal the evidence, the jury could have disbelieved Appellant's claim that "picking up the gun in a way that the barrel was in the direction of [the victim] reflect[ed] stupidity, irresponsibility, thoughtlessness, and ordinary carelessness [but not] culpable criminal recklessness"  and could have instead reasonably inferred that his act of one-handedly picking up a gun that he knew to be heavy, to be loaded, and to potentially have a light trigger while the victim was standing nearby reflected that he was aware of but

---

[5]In determining whether the evidence supports a finding of recklessness, a statement that a defendant did not intend to kill the victim "cannot be plucked out of the record and examined in a vacuum."  *Gahagan*, 242 S.W.3d at 86 (first citing *Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986); and then citing *Martinez v. State*, 16 S.W.3d 845, 847 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd)).

12

consciously disregarded a substantial and unjustifiable risk that the gun could discharge and kill the victim. *See Kirkwood*, 2021 WL 2656672, at \*2; *Heredia*, 2020 WL 6789092, at \*4; *Gahagan*, 242 S.W.3d at 83–84, 88. We overrule Appellant's fifth point.

## IV. Refusal to Give an Instruction on Voluntary Conduct Was Not Error

During the charge conference, Appellant requested that the trial court include an instruction on voluntariness in the jury charge. After hearing argument from counsel on both sides, the trial court denied Appellant's requested instruction.

In his first point, Appellant argues that the trial court erred by denying his request for an instruction on voluntary conduct under Texas Penal Code Section 6.01. Because Appellant's action of picking up the gun fails to meet the criteria for an involuntary movement, we rule against him.

### A. Standard of Review

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

### B. Applicable Law

We borrow from a 2024 opinion from the Austin Court of Appeals explaining the trial court's duty to give requested instructions and what constitutes an involuntary action:

13

A trial court must instruct the jury on the "law applicable to the case." Tex. Code Crim. Proc. [Ann.] art. 36.14. "The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense." Tex. Penal Code [Ann.] § 2.03(c). A defense is raised by the evidence only "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). "In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven." *Id.* at 658. "A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of the trial court's opinion about the credibility of the defense." *VanBrackle v. State*, 179 S.W.3d 708, 712 (Tex. App.—Austin 2005, no pet.). "When a judge refuses to give an instruction on a defensive issue because the evidence supporting it is weak or unbelievable, he effectively substitutes his judgment on the weight of the evidence for that of the jury." *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997) (quoting *Woodfox v. State*, 742 S.W.2d 408, 410 (Tex. Crim. App. 1987)). "When reviewing a trial court's refusal of a requested defensive instruction, we view the evidence in the light most favorable to the defendant's requested instruction." *Maciel v. State*, 631 S.W.3d 720, 722 (Tex. Crim. App. 2021).

. . . Section 6.01(a)[6] voluntariness "refers only to one's own physical body movements." *Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013) (quoting *Rogers v. State*, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003)). A "movement is considered involuntary only if that movement is 'the nonvolitional result of someone else's act[; was] set in motion by some independent non[]human force[; was] caused by a physical reflex or convulsion[;] or [was] the product of unconsciousness, hypnosis[,] or other nonvolitional impetus.'" *Id.* (quoting *Rogers*, 105 S.W.3d at 638). Even "a voluntary act that comprised a portion of the commission of the offense is sufficient to satisfy the requirement of Section 6.01(a), even if that voluntary act was accidental or the consequences of that act were unintended." *Id.* Relatedly, "the

---

[6]Section 6.01(a) states that "[a] person commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession." Tex. Penal Code Ann. § 6.01(a).

'voluntary act' requirement does not necessarily go to the ultimate act (e.g., pulling the trigger)"; instead, the requirement is "only that criminal responsibility for the harm must 'include an act' that is voluntary (e.g., pulling the gun, pointing the gun, or cocking the hammer)." *Id.* (quoting *Rogers*, 105 S.W.3d at 638).

*Jones v. State*, 691 S.W.3d 231, 245–46 (Tex. App.—Austin 2024, pet. ref'd). Furthermore, "the issue of the voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state." *Brown*, 955 S.W.2d at 280.

### C. Analysis

In order to try to fit within the voluntariness paradigm of Section 6.01(a), Appellant argues that "the gun discharged on its own or due to the light trigger pull." The evidence, however, does not support Appellant's theory. The State's firearms expert tested Appellant's gun and found that it would not discharge on its own and that the trigger pull was "normal." Moreover, Appellant's act of picking up the gun to move it to another room does not meet the criteria of an involuntary movement, that is, it was not the nonvolitional result of someone else's act; it was not set in motion by some independent nonhuman force; it was not caused by a physical reflex or convulsion; and it was not the product of unconsciousness, hypnosis, or other nonvolitional impetus. Appellant's act of moving the gun was voluntary.

Appellant also contends that his "acts, while voluntary in themselves, were not committed with the requisite intent[, e.g., recklessness,] so their voluntary nature does not negate the required [Section] 6.01 charge." The Court of Criminal Appeals has made clear that intent is not part of the voluntariness calculus. *See Farmer*, 411 S.W.3d

15

at 905–06 (explaining that when the Texas Legislature rejected the defense of "accident," it adopted two separate defenses—the defense of "involuntary act" and the defense that a defendant lacked the requisite mental state to commit the crime—and that Section 6.01(a) covers only the act); *Brown*, 955 S.W.2d at 280.

We conclude that even when viewed in the light most favorable to the requested instruction, the evidence did not raise the defensive issue of involuntary conduct. We overrule Appellant's first point.

## V. Challenges Related to Admission of Extraneous-Offense Evidence

In his second, third, and fourth points, Appellant raises various arguments related to Officer Palomares's testimony about Appellant's prior possession of a firearm. Prior to Officer Palomares's testimony, the State requested the trial court to hold a hearing outside the presence of the jury "for possible 404(b) extraneous," and the State questioned Officer Palomares about his May 7, 2022 encounter with Appellant. We set forth a summary of this hearing before addressing each of Appellant's points in turn.

> At the hearing, the State sought to offer the May 7, 2022 incident
>
> not under 404(b) as a bad act or extraneous act[ but] as evidence of knowledge with his understanding and possession of a firearm. It's a different firearm from a different time. And we don't want to give the impression with the jury that the firearm in this particular case was the only firearm that [Appellant] has ever interacted with, has possessed[,] or [has] controlled.

16

The State said that it would "be okay with any type of limiting instruction for the jury to only consider . . . the 5-7-2022 incident as evidence of knowledge and familiarity with firearm[s]."

Appellant objected to the May 7, 2022 incident based on Rules 401, 402, 403, 404(b), and 405 and on lack of notice under Article 39.14.[7] He further objected "under due process and the guarantees of fair trial under [the] Texas and United States Constitution[s]." And he requested that the trial court give a limiting instruction to the jury so that "they may only consider if they believe it beyond a reasonable doubt and [that] they can only consider . . . whether that makes him familiar with firearms in general."

The trial court concluded that Appellant's "familiarity with semiautomatic pistols" was relevant and that it was "not 404(b)"[8] and so there was no notice issue.

---

[7]Defense counsel pointed out that the State's notice of extraneous offenses did not mention that Appellant had possessed a gun during the May 7, 2022 offense and that notice was not given until after trial had begun.

[8]Both the State and the trial court contend that the prior firearm possession incident was "not under 404(b)" or "not 404(b)." We have previously noted that to constitute an extraneous offense under Texas Rule of Evidence 404(b)(1), the evidence must show that a crime or bad act was committed and that the defendant was connected to it. *See Oliver v. State*, No. 02-23-00262-CR, 2025 WL 646215, at *5 n.2 (Tex. App.—Fort Worth Feb. 27, 2025, no pet.) (mem. op., not designated for publication) (citing *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993)). Although such evidence is normally inadmissible as character evidence, *see* Tex. R. Evid. 404(b)(1), Rule 404(b)(2) states that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, *knowledge*, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b)(2) (emphasis added). At trial, the State argued that it desired to present the firearm-

17

The trial court instructed the State that the evidence needed to be presented in a way "that does not get into an extraneous bad act" and stated that the purpose "would be to simply get before the jury that [Appellant] has possessed [a] semiautomatic pistol in the past . . . on this particular date." The trial court also concluded that a limiting instruction was not appropriate because "this is not 404(b)." The trial court overruled Appellant's objections.

In front of the jury, after establishing Officer Palomares's credentials and training as a police officer, the State asked him about his encounter with Appellant on May 7, 2022, which revealed that Appellant had possessed a firearm—a different firearm than the one used in the shooting:

> Q. . . . And let me bring your attention to May 7th of 2022. On the early morning hours of that day, . . . did you have occasion to encounter [Appellant]?
>
> [DEFENSE COUNSEL]: Your Honor, at this time we renew all our objections outside the presence, running objection.
>
> THE COURT: Overruled.
>
> THE WITNESS: I do.
>
> Q. (BY [THE PROSECUTOR]) And . . . so the early morning hours of May 7th, you encountered a group of people walking down the street; is that right?

possession evidence to show Appellant's familiarity or knowledge with firearms generally; on appeal, the State contends that such evidence would go to disproving lack of accident. Under either theory, the evidence would fall under Rule 404(b)(2). It is therefore unclear why both the State and the trial court categorized such evidence as "not 404(b)."

A. Yes, sir, at 3:29 a.m.

Q. Okay. And did you want to speak to that group?

A. I did.

Q. Okay. And was [Appellant] part of that group?

A. Yes, sir.

Q. Were you able to eventually speak to [Appellant]?

A. Yes.

Q. Okay. And were you able to speak with him when you were speaking to the original group?

A. Yes, sir.

Q. Okay. And did you have to follow him for a bit?

A. I did.

Q. Okay. And while you were following him -- well, before -- as you were following him --

THE COURT: Hold on a second. Will the attorneys approach, please.

(At the Bench, on the record.)

THE COURT: Okay. Just cut to the possession of the gun, okay. All right. Just get to that. Okay?

[THE PROSECUTOR]: Okay.

(Bench conference concluded.)

THE COURT: All right. You may proceed . . . .

[THE PROSECUTOR]: Thank you, Judge.

19

Q. (BY [THE PROSECUTOR]) So did you -- that night, was [Appellant] in possession of a firearm?

A. Yes, sir.

Q. And can you describe for the jury that firearm?

A. The firearm . . . was a Glock handgun, dark in color, and then also had a 50-round magazine at the bottom, 50-round drum.

[THE PROSECUTOR]: State passes this witness, Judge.

THE COURT: All right. Cross-examination.

[DEFENSE COUNSEL]: None.

During its closing argument, the State's only reference to Appellant's prior firearm possession was as follows: "Remember, this was not his first gun. You heard from Officer Palomares, this is not his first firearm." The remainder of the State's closing argument and rebuttal focused on the gun that was used in the shooting, noting that it was heavy, that Appellant was familiar with its weight and how it worked because he had previously shot it, and that he had brought the gun to the apartment on the night of the shooting.

## A.    Notice Argument Not Preserved

In his second point, Appellant argues that the trial court erred by admitting evidence in violation of the notice requirements of Texas Code of Criminal Procedure Article 39.14, Texas Rule of Evidence 404(b), and due process of law. Specifically, Appellant contends that the State gave notice relating to his May 7, 2022 evading-arrest offense but that the notice did not mention that he possessed a gun during that

20

incident—evidence that the State admitted through Officer Palomares at the conclusion of the guilt–innocence phase. Appellant argues that despite the State's having possession of the evading case file that contained the gun information since May 2022, it did not give the defense the evading report until after the trial had begun. Appellant, however, did not move for a continuance to preserve this point for our review.

To preserve error regarding the State's violation of Article 39.14, an appellant must request a continuance in the trial court. *Garza v. State*, No. 13-22-00599-CR, 2024 WL 4986401, at *8 (Tex. App.—Corpus Christi–Edinburg Dec. 5, 2024, pet. ref'd) (mem. op., not designated for publication). Similarly, to preserve error regarding the State's failure to provide reasonable notice of its intent to use extraneous-offense evidence under Rule 404(b), a defendant must request a continuance. *Knight v. State*, 457 S.W.3d 192, 203 (Tex. App.—El Paso 2015, pet. ref'd). Likewise, an appellant must request a continuance to preserve a due-process complaint. *See Garza*, 2024 WL 4986401, at *8–9.

As noted above, Appellant objected on numerous grounds to the State's proposed use of Appellant's May 7, 2022 possession of a firearm. Appellant did not, however, request a continuance. Because Appellant did not move for a continuance, he has failed to preserve any error related to the State's violation of Article 39.14, Rule 404(b), and due process. *See id.*; *Knight*, 457 S.W.3d at 203. Accordingly, we overrule Appellant's second point.

## B. No Harm from Admitting Firearm-Possession Evidence

In his third point, Appellant argues that the trial court erred by admitting extraneous bad conduct under Texas Rules of Evidence 401, 402, 403, and 404. Appellant contends that Officer Palomares's testimony about Appellant's possession of a gun on May 7, 2022—which was approximately four months prior to the shooting at issue—was not relevant and that the probative value of such testimony was substantially outweighed by the prejudicial effect. Appellant further argues that the highly prejudicial nature of this evidence prevented a fair trial and that he was therefore harmed by its admission. Assuming without deciding that admission of the firearm-possession evidence was error, the record does not show that Appellant was harmed.

### 1. Standard of Review

For purposes of our analysis, we will assume without deciding that admission of the firearm-possession evidence was error. Having concluded that the trial court erred, we must review the record to determine if the error is reversible. *See* Tex. R. App. P. 44.2. Because the error is not constitutional, we apply Rule 44.2(b). Tex. R. App. P. 44.2(b). That rule requires us to disregard any nonconstitutional error that does not affect appellant's substantial rights. *Id.* A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S.

22

750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

### 2. Harm Analysis

In reviewing the character of the alleged error and how it might have been considered in connection with other evidence, the jury could have determined from Officer Palomares's testimony that Appellant frequently carried a firearm and was thus familiar with firearms generally. The nature of the evidence supporting the verdict and the existence and degree of additional evidence indicating Appellant's guilt was great: Appellant admitted that he had picked up the loaded gun to move it, the evidence showed that the victim was standing nearby when he did so, Appellant then attempted to dispose of the evidence and lied to the 911 operator the first time he called, and the State's expert made clear that the gun would not discharge on its own.

23

Moreover, the testimony about Appellant's prior possession of a firearm was brief, taking up approximately two pages of the over 300 pages of testimony given during the guilt–innocence phase. Officer Palomares did not expand on the gun possession, explain whether Appellant had been charged with any offense resulting from the encounter with him on May 7, 2022, or even indicate to the jury that Appellant's possession of a firearm was a crime. Furthermore, only two sentences of the State's closing argument mentioned Appellant's prior possession of a firearm; the remainder of the State's closing argument and rebuttal focused on Appellant's familiarity with the gun used in the shooting. *See Turner v. State*, No. 01-21-00569-CR, 2023 WL 3510911, at *7–8 (Tex. App.—Houston [1st Dist.] May 18, 2023, pet. ref'd) (mem. op., not designated for publication) (assuming that admission of possession of a firearm was error in aggravated-robbery case but holding that it was not harmful error); *Norton v. State*, Nos. 05-01-00344-CR, 05-01-00345-CR, 2002 WL 31439380, at *5 (Tex. App.—Dallas Nov. 1, 2002, pet. dism'd, untimely filed) (not designated for publication) (assuming that it was error for the State to admit evidence that appellant was in possession of a firearm a few months before the offenses and holding that error was harmless because appellant admitted having a gun on the day of the offenses and that it was thus unlikely that his possession of a handgun a few months before the offenses would have had any effect on the jury's verdict).

We conclude that, in the context of the entire case against Appellant, the trial court's error in admitting testimony about Appellant's prior possession of a firearm

did not have a substantial or injurious effect on the jury's verdict and did not affect Appellant's substantial rights. *See King*, 953 S.W.2d at 271–73. Thus, we must disregard the error. *See* Tex. R. App. P. 44.2(b). Accordingly, we overrule Appellant's third point.

## C.     Failure to Give Limiting Instruction Was Harmless

In his fourth point, Appellant argues that the trial court violated Texas Rule of Evidence 105 by refusing to give the jury his requested limiting instruction regarding the firearm-possession testimony. Even assuming that the trial court erred, we conclude that such error was not harmful.

### 1.     Limiting-Instruction Law and Standard of Review

We borrow from an opinion from the Corpus Christi–Edinburg Court of Appeals that sets forth the law on limiting instructions and the standard of review that we apply in reviewing the failure to give such instructions:

> Upon request, the trial court must give a limiting instruction to the jury at the time that extraneous[-]offense evidence is offered. *See* Tex. R. Evid. 105(a); *see also Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007). When evidence is admitted for a limited purpose, the trial court must, upon request, provide a midtrial limiting instruction, as failing to provide the instruction may improperly result in the jury['s] forming a negative inference about the defendant. *Jackson v. State*, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999). This improper inference, once formed, cannot easily be cured by an instruction in the jury charge. *Id.*
>
> If the trial court errs [by] failing to give a limiting instruction when required, the appellate court shall determine whether the error is harmless. *See Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996) (holding that harmless-error analysis is applicable to trial court's failure to give Texas Rule of Evidence 105(a) limiting instruction upon

25

admission of extraneous[-]offense evidence). Because the failure to give a timely Rule 105(a) limiting instruction is non[]constitutional error, Texas Rule of Appellate Procedure 44.2(b) applies. Tex. R. App. P. 44.2(b); *Rankin v. State*, 995 S.W.2d 210, 215 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd).

*Reese v. State*, No. 13-21-00329-CR, 2023 WL 2421663, at *7 (Tex. App.—Corpus Christi–Edinburg Mar. 9, 2023, pet. ref'd) (mem. op., not designated for publication). As set forth above in our discussion of Appellant's third issue, when applying Rule 44.2(b), we disregard the error unless it affected Appellant's substantial rights. Tex. R. App. P. 44.2(b).

### 2. What the Record Shows

As noted above, Appellant requested the trial court to instruct the jury that it could only consider whether Officer Palomares's testimony about Appellant's prior possession of a firearm made him familiar with firearms in general. The trial court denied Appellant's request.[9]

### 3. Harm Analysis

Assuming without deciding that it was error for the trial court to refuse to give a limiting instruction, Appellant's argument does not survive a harm analysis. As discussed in the harm analysis of Appellant's third point, the record reflects ample evidence of his guilt, and for the sake of brevity, we will not repeat that evidence here. Moreover, the firearm-possession evidence was "no more serious than the allegations

---

[9]The trial court did, however, state in the charge that Appellant was "not on trial for any act, conduct, or offense not alleged in the indictment."

forming the basis for the indictment," minimizing its prejudicial effect even in the absence of a contemporaneous limiting instruction. *See Robisheaux v. State*, 483 S.W.3d 205, 218, 220 (Tex. App.—Austin 2016, pet. ref'd). And the State's closing argument and rebuttal only briefly mentioned the prior firearm possession; the majority of the time was spent on Appellant's familiarity with the gun that was used in the shooting.

Based on our analysis of the record, we have fair assurance that the error did not influence the jury or had but a slight effect, and we conclude that any error by the trial court in failing to give a contemporaneous limiting instruction did not affect Appellant's substantial rights. *Cf. Reese*, 2023 WL 2421663, at *9 (holding that any error by the trial court in failing to give a contemporaneous limiting instruction did not affect appellant's substantial rights). We overrule Appellant's fourth point.

## VI. Conclusion

Having overruled Appellant's five points, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 26, 2025